(text box: 1) NO. 5-98-0657

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

________________________________________________________________________________________________

THE PEOPLE OF THE STATE OF ILLINOIS, )  Appeal from the

)  Circuit Court of

Plaintiff-Appellee, )  Williamson County.

)

)  No. 88-CF-162

)

RICHARD C. NITZ, )  Honorable 

)  John Speroni,

Defendant-Appellant. )  Judge, presiding.

________________________________________________________________________________________________

JUSTICE KUEHN delivered the opinion of the court:  

At one time, Richard Nitz knew when he was to rendevous with death, for the State of Illinois had set the appointed hour.  Death was to be Nitz’s punishment for killing Michael Miley and mutilating his body.  However, his last meal was never served.

  After losing his direct appeal, Nitz sought collateral relief from his conviction and death sentence, based upon his fitness to stand trial.  Nitz had ingested a psychotropic drug called Tranxene during the trial.  The drug was administered to quell anxiety.  The trial was conducted without a prior fitness hearing to determine the effect of the psychotropic medication on Nitz’s mental well-being.  In the absence of a hearing, our high court presumed Nitz to be unfit because of the medication’s use and found that the process to the verdict and death sentence was constitutionally infirm.  
People v. Nitz
, 173 Ill. 2d 151, 670 N.E.2d 672 (1996).  It reversed the conviction, vacated the sentence, and ordered a new trial.

  The State prosecuted Nitz again for the same crime, but it did not charge Nitz in the same manner, and it did not seek capital punishment.  It charged three counts of first-degree murder.  Each count alleged that Nitz shot Miley with a gun and thereby caused Miley’s death.  The counts differed only in alleging different mind-sets under which Nitz performed that act.  A Jackson County jury engaged in lengthy deliberations before arriving at its verdict.  It found that Nitz had not intended to kill Miley and that Nitz had no knowledge that shooting Miley would in fact cause Miley’s death.  It acquitted Nitz on the two charges that called for those findings.  The jury returned a guilty verdict on a third count, finding that Nitz was aware of the fact that shooting Miley created a strong probability of death or great bodily harm.  Based upon the jury’s finding of guilt and the trial judge’s finding that this particular first-degree murder was accompanied by brutal and heinous behavior indicative of wanton cruelty, the trial judge sentenced Nitz to imprisonment for the rest of his life.  Nitz appeals the verdict and sentence. 

The particular facts surrounding the offense for which Nitz was again convicted are recounted in detail by the supreme court in 
People v. Nitz
, 143 Ill. 2d 82, 572 N.E.2d 895 (1991).  We address only those limited facts necessary to an understanding of the legal issues raised on this appeal. 

Nitz challenges the validity of the verdict based upon the following arguments:  (1) that he was deprived of the constitutional right to testify in his own defense when the trial judge ruled that his testimony, if given, could be impeached with prior sworn testimony given during the first trial, (2) that jurors lied during 
voir dire 
and convicted him based upon knowledge of his earlier conviction and his failure to testify
 and that the jury foreman lied about his impartiality during 
voir
 
dire
 and concealed his preconceived belief in Nitz’s guilt, (3) that he was improperly prevented from presenting evidence of other possible suspects who might have murdered Miley, (4) that the jury should have been instructed on the offense of second-degree murder, and (5) that he was improperly prevented from impeaching certain State witnesses with evidence of their prior convictions.   

Nitz also challenges the validity of his sentence based upon the following arguments:  (1) that his conduct was not brutal and heinous behavior suggestive of wanton cruelty and therefore cannot support the judge’s factual finding, (2) that the trial judge should have eased the sentence based upon certain evidence offered in mitigation, and finally, (3) that the receipt of a natural-life sentence based upon a factual finding not determined by a jury under a reasonable doubt standard violated his constitutional rights to due process, notice, and a trial by jury.  

For the following reasons, we affirm the conviction and modify the sentence to a 60-year prison term. 

The first argument is premised upon Nitz’s absolute right to testify in his own defense.  He maintains that this right was taken from him when the trial judge ruled that the State could use his testimony at the first trial, provided that it proved to be inconsistent with testimony tendered here.  Nitz tried to bar the testimony’s use, based upon his presumptive incompetence during the first trial.  He maintains that if an involuntary confession cannot be used for impeachment purposes, prior testimony from an incompetent defendant should not be used as well.  

We note that the foundation for this argument, Nitz’s presumptive incompetence and his prior testimony’s unreliability because of that fact, has fallen prey to a supreme court that has come full circle in its understanding of our fitness statute.  The same court that reversed Nitz’s conviction, vacated his death sentence, and granted him a new trial because a fitness hearing was not held no longer believes that the legislature intended to require one.  We now know what only three members of the supreme court knew in 1996 when Nitz was granted postconviction relief.  We cannot presume Nitz unfit simply because he was treated with Tranxene to manage anxiety disorders during the trial. 

The supreme court has entirely abandoned the legal basis for Nitz’s earlier reprieve.  
People v. Mitchell
, 189 Ill. 2d 312, 328-31, 727 N.E.2d 254, 265-67 (2000).  Had the supreme court read our fitness statute in the same manner a few years ago, in all likelihood Nitz would be appealing in that undiscovered forum from whose bourn no traveler returns.

Nitz counters this legal turnabout with several arguments that pertain to the question of his actual fitness, and his prior testimony’s arguable unreliability, given the ingestion of mood-altering medication.  We need not address them.  

Nitz was not deprived of the right to give testimony at his trial.  He was simply not afforded the luxury of doing so without challenge from earlier sworn testimony that 
might
 have proven to be inconsistent.  We have no way of knowing what prejudice, if any, resulted from the trial court’s ruling.  Nitz did not testify at the trial.  We suspect that the choice was thrust upon him by virtue of the State’s power to use prior testimony sharply at odds with what he wanted to say.  Notwithstanding, his choice to forego testifying, standing alone, cannot support the conclusion that he was prejudiced.  See 
People v. Benson
, 266 Ill. App. 3d 994, 1001-02, 641 N.E.2d 617, 623-24 (1994).  Without his testimony, we have no basis to review the question of trial court error.  As our supreme court has noted in an analogous context: 

“[D]efense counsel may not have it both ways by altering their trial strategy to make the best of the trial court’s order, depriving the reviewing court of a reviewable record, and still maintain that the order was erroneously entered.”  
People v. Whitehead
, 116 Ill. 2d 425, 443-44, 508 N.E.2d 687, 693 (1987).

Nothing in this record tells us what Nitz hoped to establish with his testimony or how the trial court’s ruling erroneously impacted what he hoped to say.  Without a record, we can find no error in the trial court’s ruling.

Nitz’s second argument raises a specter of juror dishonesty and misconduct.  It touches directly upon the sanctity of the jury deliberation process.  It rests upon a juror’s disavowal of her vote to convict, coupled with her assessment of the mental processes by which other jurors arrived at a guilty verdict, based upon comments they made during jury deliberation.   

Having lost his bid to prevent the State from using his prior testimony, Nitz’s strategy to defend without testifying prompted painstaking inquiry of prospective jurors about a defendant’s right not to testify.  Apart from questions posed by defense counsel, questions designed to condition the jury to Nitz’s forthcoming silence, the trial judge spoke to each juror about the right not to testify and determined that its exercise would not affect their outlook on the case.  In essence, the trial judge engaged in the same colloquy with each prospective juror, and each one answered in identical fashion.  Here is a typical example.

“Q.  You understand that Mr. Nitz does not have to testify or present any evidence?

A.  Yes.

Q.  That is a fundamental concept of our law.  Will you hold it against him if he chooses not to testify or to present any evidence?

A.  No.”

Not one of the 12 jurors selected to serve was spared the inquiry.  Moreover, all of the jurors selected assured the court, counsel, and Nitz that the absence of his testimony would not be considered in arriving at a verdict. 

Another topic of intense inquiry during 
voir dire
 was the extent to which each juror already possessed knowledge about the facts of the case.  Despite a venue change to minimize juror awareness of prior events, the earlier convictions of Nitz and his wife, Rita, were generally known to the prospective jurors.  Each member of the jury said that he or she would decide the case only on the facts and evidence presented at the trial and not on prior knowledge of the case.

[The following text is nonpublishable under Supreme Court Rule 23 (166 Ill. 2d R. 23).]

One member of the jury, ultimately its foreman, was the brother of one of the witnesses who first discovered Miley’s headless corpse.  The juror assured the trial judge and Nitz that he was not in Illinois at that time and that he did not know anything about the case.  Given his 
voir dire
 answers and the fact that his brother’s testimony was introduced by way of stipulation, he was selected as a juror.

[The preceding text is nonpublishable under Supreme Court Rule 23.]

Joan Davis was one of the jurors selected.  She voted to return a guilty verdict and affirmed that vote in Nitz’s presence when the jury was polled in open court.  Before the hearing on posttrial motions, she provided Nitz with a sworn affidavit that impeached her verdict and assailed the deliberation process.  The affidavit explained that Davis was one of four “hold out” jurors, a status she held by virtue of her belief that the State failed to prove its case against Nitz.  According to Davis, she abandoned her sworn duty to Nitz because she felt pressured and believed what other jurors told her about the sentence that would be imposed.  She threw her own beliefs to the wind, voted to convict someone who, in her mind, was not proven guilty, and affirmed that misconduct in open court, because she believed that Nitz would be sentenced to time served.    

The affidavit also addressed misconduct on the part of other jurors.  Davis set forth that jurors commented about Nitz’s failure to testify and that the jurors further commented that therefore Nitz must be guilty.  The affidavit also set forth that at least one juror commented that the jury had no choice but to convict, given the fact that Nitz had already been convicted.  The affidavit concluded with a statement that Davis was upset that “other jurors would consider the other trials, including Nitz’s wife’s trial results[,] and that they would consider the fact that Mr. Nitz didn’t testify.”

Based upon the affidavit, the trial judge was asked to award a new trial or, in the alternative, to conduct a hearing to determine if jurors had been dishonest in answering 
voir dire
 questions.  The trial judge expressed his belief that jurors had been forthright and honest in their responses to his questions, and the judge refused the request.  He found that the affidavit was an attempt to impeach the verdict by raising matters that involved the nature and process of jury deliberation.

Nitz now asks us for a new trial or, in the alternative, a remand to conduct a hearing on the possibility of juror perjury.

We adhere to the longstanding rule of law that the testimony of jurors will not be received to establish their own mistake or misconduct, to prove that of their fellows while in the jury room, or to otherwise impeach their own verdict.  See 
Phillips v. Town of Scales Mound
, 195 Ill. 353, 363-64, 63 N.E. 180, 184 (1902).  This certainly applies to juror Davis’s revelation about her own misconduct, as well as to any misconduct engaged in by the other jurors.  Juror Davis may not testify as to what transpired in the jury room as a means by which to impeach her, or the other jurors’, verdict.  See 
Sanitary District of Chicago v. Cullerton
, 147 Ill. 385, 390-92, 35 N.E. 723, 724-25 (1893).  

Nitz claims that this well-established rule of law, designed to protect the sanctity of jury verdicts, is not at issue.  He claims to invoke an exception to the rule.  He points to our acceptance of a verdict’s challenge where it can be shown that a prospective juror testified falsely on 
voir dire
 and the testimony involved a matter of potential bias and prejudice.  See 
Hockett v. Dawdy
, 180 Ill. App. 3d 491, 497, 536 N.E.2d 84, 87 (1989).  Based upon this principle, he contends that the verdict was reached by jurors who committed perjury when they said that a failure to testify would not be considered.  He also maintains that jurors committed perjury when they said that the verdict would be decided solely upon facts and evidence presented at the trial.  It follows from this position that the affidavit was not really offered to impeach the verdict by way of a showing that jurors engaged in misconduct during deliberations.  Rather, the affidavit was offered to impeach the verdict by showing how jurors lied in answer to inquiries made during 
voir dire
. 

Although juror Davis believes that jurors used Nitz’s earlier conviction and failure to testify as a basis to convict, we are not willing to accept her conclusion.  Juror Davis may well have heard improper comments during deliberations, but other than herself, she does not know and cannot say why any particular juror voted to convict.  While certain jurors may have expressed thoughts inconsistent with their charge, we would like to think that all of the jurors, save juror Davis, voted their conscience based solely upon the facts and evidence submitted.  In any event, the content of the affidavit does not prove otherwise.  

More importantly, the exception carved out by 
Hockett v. Dawdy
 was designed to deal with circumstances where jurors consciously conceal facts about themselves that would expose a predisposition, bias, or prejudice detrimental to fair and open-minded thinking.  It was not designed to police the jury deliberation room for comments inconsistent with the instructions given and to later use those comments in order to maintain that jurors failed to deliver on 
voir dire
 commitments to follow the law.  There is good reason why jurors are asked about potential silence in the face of accusation and are specifically instructed not to consider a defendant’s silence.  We know that a mute defense is going to bother and trouble people, regardless of legal guarantees that allow for it.  We suspect that the comments juror Davis heard are not all that uncommon in the process of deliberation, despite all efforts to keep jurors from such thoughts.  Hopefully, when a juror points out that the defendant failed to testify, the comment upsets another juror who promptly points out the judge’s instruction not to consider that fact.  In any event, we will not invite a massive attack on the sanctity of verdicts by allowing the use of comments made during jury deliberations to suggest that the jurors did not perform their duty to follow the law or otherwise shirked some commitment to legal principle made during 
voir dire
.  Such an exception would engulf the rule.

Juror Davis explicates our view.  She told the judge and the parties during 
voir dire
 that she would decide the case solely upon the facts and the evidence presented.  She also told them that if she did not believe that the evidence established guilt beyond a reasonable doubt, if she believed that the State failed to prove its case, she would find the defendant not guilty.  According to her, she did not do either.  Her decision was guided by a need to relieve herself of discomfort from peer pressure and a misadvised belief that she would not do Nitz much harm by abandoning her convictions.  If the statements she made on 
voir dire
 provided a basis to impeach the verdict and warranted a new trial, she, and any other juror, would be empowered to impeach a verdict by confessing misconduct.  The misconduct would simply have to be recast from the deliberation room back to the 
voir dire
 session where commitments to perform the duties of a juror were made.  

Nitz’s request does not raise a question of juror dishonesty on a matter of bias or prejudice.  It constitutes an effort to impeach a jury verdict on matter that involves the nature and process of deliberations.  Jury verdicts should be, and will be, insulated from such attack.    

[The following text is nonpublishable under Supreme Court Rule 23.]

The second part of this argument deals with a letter.  It was written by the jury foreman after he read a newspaper account of the sentencing.  The letter was sent to the trial judge and expressed the jury foreman’s agreement with comments that the judge made when he sentenced Nitz.  The letter contains the following passage, “I[,] too, thought that Mr. Nitz was a danger to society 10 years ago and is still a threat.”  Nitz points to the juror’s testimony on 
voir dire
 that clearly conveyed an absence of predisposition, bias, or prejudice.  He argues that he would not have allowed the juror to be seated on the jury had the juror disclosed during 
voir dire
 his personal opinion of Nitz. 

The State reads this passage differently than Nitz, and we agree with that reading.  The jury foreman obviously found favor with the trial judge’s sentence and his reason for imposing it.  Having read the trial judge’s comments in newspaper accounts of the sentencing, he wrote to praise the judge and express his agreement with the sentence.  When he wrote that he, too, was of the opinion that Nitz was a danger "10 years ago," he was merely parroting language used by the trial judge.  He was not revealing a bias and predisposition harbored over the previous 10 years.  This was a juror who was armed with the knowledge that the trial had provided, knowledge of conduct Nitz engaged in 10 years earlier.  Given that fact, there is no reason to believe that he lied on 
voir dire.
  

[The preceding text is nonpublishable under Supreme Court Rule 23.]

The third argument deals with Nitz’s attempt to introduce evidence of other possible suspects who might have committed the murder.  Due to the space limitations imposed by Supreme Court Rule 23 (166 Ill. 2d R. 23), the discussion of this issue will not be published.

[The following text is nonpublishable under Supreme Court Rule 23.]

Michael Miley was a homosexual.  There was evidence introduced by the State that tended to establish Nitz’s homophobia.  The evidence helped to explain how Nitz might have made contact with Miley.  It also helped to explain why Nitz would kill Miley.  The defense wanted to show that others in the Carbondale area harbored the same hatred for homosexuals.  The trial court found that such evidence, without a showing that these other individuals were connected in some way with this crime, was too speculative.  We agree.  

A defendant may attempt to prove that someone else committed the crime for which he is charged, but that right is not without limitation.  
People v. Enis, 
139
 
Ill. 2d 264, 281, 564 N.E.2d 1155, 1161 (1990).  Such evidence is relevant and admissible only if a close connection can be demonstrated between someone else and the commission of the offense.  
People v. Wilson
, 271 Ill. App. 3d 943, 948, 649 N.E.2d 1377, 1382 (1995).  There must be some evidence from which to reasonably infer that a specific individual other than the defendant might have committed the crime.  Extraneous conduct not connected with the crime itself may not be shown.  
People v. Smith
, 122 Ill. App. 3d 609, 616, 461 N.E.2d 534, 539 (1984).  Evidentiary rulings of this sort rest within the sound discretion of the trial court, and this court will not reverse the trial court’s decision absent a clear abuse of discretion.  
People v. Kidd
, 147 Ill. 2d 510, 535, 591 N.E.2d 431, 442 (1992).

We believe that the trial judge properly exercised his discretion in refusing to allow evidence that the Carbondale area harbored more than one bigot when it came to homosexuality.  Unfortunately, there is a wealth of bigotry and hatred in this world.  Proof of other homophobia lacks relevancy, for it does not tend to prove that someone else rather than Nitz committed the crime.  

Nitz targeted certain witnesses for the prosecution and wanted to present them as possible suspects.  He wanted to present random facts about those witnesses and to claim that those facts, coupled with shared homophobia, tended to make them legitimate suspects.  He wanted to prove that one of the State’s witnesses was once married to a homosexual-hater and that two other witnesses, both homosexual-haters, were involved in a shooting incident the night before Miley’s death.  These facts bear no connection to the murder.  They provide nothing from which to infer a link to Miley’s death.  Their admission into evidence would have invited rank speculation.  See 
Smith
, 122 Ill. App. 3d at 616, 461 N.E.2d at 539.  

Although Nitz correctly asserts that “concrete” proof is not necessary, it is simply not enough to show that certain people who shared his homophobia fired a gun at someone else and for that reason might have killed Michael Miley.  Nitz had to be able to tie someone other than himself to the commission of the crime.  He had to be able to produce relevant evidence from which the jury could reasonably conclude that he did not commit the crime because someone else did.  
The evidence did not have to prove someone else’s guilt beyond a reasonable doubt.  It did not have to meet any burden.  However, it did have to meet the test of relevancy.  The proffered evidence fell far short of meeting this test.  It never crossed that line that separates interesting speculation from reasonable inference.  Accordingly, the evidence was properly excluded and the trial court did not abuse its discretion in so ruling.

[The preceding text is nonpublishable under Supreme Court Rule 23.]

 Next, Nitz quarrels with the trial judge’s refusal to instruct on the offense of second-degree murder.  Nitz argues that the second-degree-murder instruction was warranted on the basis of mutual quarrel or combat.  The instruction should be given where there exists some evidence of serious provocation which, if believed by the jury, would reduce the crime to second-degree murder.  
People v. Kidd
, 295 Ill. App. 3d 160, 167, 692 N.E.2d 455, 460 (1998).  

A person commits second-degree murder when “[a]t the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by the individual killed or another whom the offender endeavors to kill, but he negligently or accidentally causes the death of the individual killed.”  720 ILCS 5/9–2(a)(1) (West 1996).  “Serious provocation” is defined as “conduct sufficient to excite an intense passion in a reasonable person.”  720 ILCS 5/9–2(b) (West 1996).  The defendant must be acting under a sudden and intense passion spurred from serious provocation that the law recognizes as reasonable.  
People v. Garcia
, 165 Ill. 2d 409, 429, 651 N.E.2d 100, 110 (1995).  The only categories of provocation that courts recognize as sufficient to warrant a second-degree-murder instruction are mutual quarrel or combat, substantial physical injury or assault, illegal arrest, or adultery with one’s spouse.  
Garcia
, 165 Ill. 2d at 429, 651 N.E.2d at 110.  Passion on behalf of the defendant, no matter how violent, will not relieve him of culpability for first-degree murder unless it is engendered by provocation that the law recognizes as reasonable.  
Garcia
, 165 Ill. 2d at 429
, 651 N.E.2d at 110.  

Mutual quarrel or combat is defined as a “ ‘fight or struggle entered into by both parties willingly or by mutual fight upon a sudden quarrel and in hot blood upon equal terms ***.’ ”  
People v. Jackson
, 304 Ill. App. 3d 883, 893, 711 N.E.2d 360, 368 (1999) (quoting 
People v. Rivera
, 255 Ill. App. 3d 1015, 1026, 627 N.E.2d 294, 301 (1993)).  The confrontation must be mutual, and the evidence must indicate that both the accused and the victim willingly participated in a fight.  
Jackson
, 304 Ill. App. 3d at 893, 711 N.E.2d at 368.  In addition, the evidence will not support a second-degree-murder instruction where there is provocation but the defendant’s retaliation is not proportional.  
Jackson
, 304 Ill. App. 3d at 893
, 711 N.E.2d at 368.

A defendant is entitled to an instruction on his theory of the case if there is some foundation for the instruction in the evidence, and if there is such evidence, it is an abuse of discretion for the trial court to refuse to so instruct the jury.  
People v. Jones
, 175 Ill. 2d 126, 131-32, 676 N.E.2d 646, 649 (1997).

We find that the trial court did not abuse its discretion in refusing to give Nitz’s second-degree-murder instruction, because Nitz did not present sufficient evidence to warrant giving that instruction.  There is nothing in the evidence to establish that Nitz was acting under a sudden and intense passion resulting from serious provocation at the time he beat and killed Miley.  This was not mutual combat or quarrel as that term has been defined.  It was not a fight on equal terms.  

In an attempt to support his claim of mutual quarrel or combat, Nitz points to testimony that Miley followed him to his trailer, exited his car, and advanced to the steps of Nitz’s front porch.  Nitz also points to the testimony of Michael Stearns, who testified that Nitz told him that he had killed a homosexual with whom he had a “run-in,” and the testimony of Danny Walker, who testified that Nitz had told him that words had been exchanged before Nitz killed Miley.

Mere words, gestures, or trespass to property do not constitute the kind of serious provocation contemplated by the statute.  
People v. Strader, 
278 Ill. App. 3d 876, 884, 
663 N.E.2d 511, 516 (1996).  The evidence here shows that there was no struggle with Miley prior to the time that Nitz struck him with a baseball bat, shot him in the head, and decapitated him.  The evidence shows that no more than words were exchanged.  No evidence was presented to show that Miley threatened Nitz, and even if the victim’s act of following Nitz home could be viewed as provocation, Nitz’s retaliation was not proportional.  The nature of the contact characterized by Nitz beating Miley with a baseball bat while Miley remained “unarmed” could hardly meet the definition of mutual combat, which envisions a fight or struggle on equal terms.  See 
Jackson
, 304 Ill. App. 3d at 894, 711 N.E.2d at 368.

Accordingly, under the facts of this case, no second-degree-murder instruction was warranted, and the trial court did not abuse its discretion by rejecting that instruction.

The fifth argument deals with the trial court’s refusal to allow Nitz to impeach two of the State’s witnesses with evidence of prior misconduct.  We will discuss this issue in the immediately following, nonpublishable portion of this opinion.  

[The following text is nonpublishable under Supreme Court Rule 23.]

Nitz wanted to impeach one of the witnesses with the fact that at the time of the trial she was on court supervision for deceptive practices.  He wanted to impeach the other witness with the fact that he had a prior felony conviction for possession of a stolen motor vehicle.

The State filed a motion 
in limine
 to prevent Nitz from presenting such evidence.  The trial court ruled that evidence of the deceptive-practices charge was not admissible because the disposition, court supervision, did not result in a conviction.  The trial court also ruled that the felony car-theft conviction was not admissible because the witness had been convicted and released from prison more than 10 years prior to giving his testimony.  

The law is well-settled that evidentiary rulings are within the sound discretion of the trial court and will not be disturbed absent an abuse of discretion.  
People v. Reid
, 179 Ill. 2d 297, 313, 688 N.E.2d 1156, 1164 (1997).

When a person is placed on court supervision, the court defers further proceedings in the case and defers entering judgment on the charge until the conclusion of the supervision period.  730 ILCS 5/5–6–3.1(a), (d) (West 1996).  “At the conclusion of the period of supervision, if the court determines that the defendant has successfully complied with all of the conditions of supervision, the court shall discharge the defendant and enter a judgment dismissing the charges.”  730 ILCS 5/5–6–3.1(e) (West 1996).  A discharge and dismissal upon a successful conclusion of a disposition of supervision shall be deemed to be without an adjudication of guilt and will not be termed a conviction.  730 ILCS 5/5–6–3.1(f) (West 1996).  Thus, until a person either successfully completes supervision or violates one or more of the conditions, she remains in much the same position as one who had merely been arrested or charged with a crime.  The law is clear that proof of arrests, indictments, charges, or the actual commission of a crime is not admissible as impeachment.  
People v. Triplett
, 108 Ill. 2d 463, 475, 485 N.E.2d 9, 15 (1985).  Therefore, the trial court properly ruled that the deceptive-practices charge for which the State witness received court supervision could not be used to impeach her credibility.

A witness cannot be impeached by a conviction if more than 10 years have elapsed since the date of the conviction or the date of release from confinement, whichever is later.  
People v. Montgomery
, 47 Ill. 2d 510, 516, 268 N.E.2d 695, 698 (1971).  Accordingly, evidence of a 1986 conviction for car theft would have been admissible at Nitz’s first trial for purposes of impeachment.  Since it would have been admissible at the first trial, it could have been used to impeach at the second trial, even though the 
Montgomery
 time frame had elapsed.
  See 
People v. Reddick
, 123 Ill. 2d 184, 203, 526 N.E.2d 141, 149 (1988).  The State concedes this point.

However, the law does not require that all convictions within the 10-year period be automatically admitted for purposes of impeachment.  The 10-year rule is merely meant to impose an outer limit upon the judge’s determination.  It does not restrict a decision to bar evidence of a prior conviction that falls within the 10-year period.  
Montgomery
, 47 Ill. 2d at 519, 268 N.E.2d at 700.  Broad discretion is vested in the trial court in evaluating the admissibility of this type of evidence.  
Reddick
, 123 Ill. 2d at 203, 526 N.E.2d at 149.  We note only that the 10-year 
Montgomery
 rule cannot be used to exclude the evidence.  See 
Reddick
, 123 Ill. 2d at 203, 526 N.E.2d at 149.  

Montgomery
 requires the court to balance the probative value of the evidence against the danger of unfair prejudice.  
People v. Walker
, 157 Ill. App. 3d 133, 137, 510 N.E.2d 29, 32 (1987).  When a witness, rather than an accused, is impeached with a prior conviction, the jury cannot use evidence of the prior conviction for any purpose other than that for which it was intended, 
i.e.
, to question credibility.  
Walker
, 157 Ill. App. 3d at 137
, 510 N.E.2d at 32.  At most, the introduction of evidence of the prior conviction would cause momentary embarrassment to the witness and would not cause unfair prejudice.  
Walker
, 157 Ill. App. 3d at 138
, 510 N.E.2d at 32.  It is difficult to conceive of a case in which the danger of unfair prejudice to the prosecution or its witnesses would substantially outweigh the probative value of evidence that such witnesses had been convicted of felonies or crimes involving dishonesty.  
Walker
, 157 Ill. App. 3d at 138
, 510 N.E.2d at 32.  Here, the prior conviction could have been considered by the jury only insofar as it related to the witness’s credibility.  In our judgment, it was wrong to exclude it.

However, we do not think the error is of a nature that warrants a reversal and a new trial.  Evidentiary errors are harmless if properly admitted evidence overwhelmingly supports a defendant’s guilt.  
Reid
, 179 Ill. 2d at 314, 688 N.E.2d at 1164.  Even if Nitz had been able to impeach the witness with his prior conviction and the jury thereafter deemed the testimony less credible, there were other State witnesses that offered the same information. Accordingly, we find that the error was harmless.  

[The preceding text is nonpublishable under Supreme Court Rule 23.]

Finally, Nitz wants us to reverse his life sentence of imprisonment.  He first argues that the trial judge erroneously found that his conduct was brutal and heinous behavior indicative of wanton cruelty.

Our fellow courts have attempted to refine what the words 
brutal
 and 
heinous
 mean.  Heinous conduct has been called “hatefully or shockingly evil” and “grossly bad” conduct.  
People v. Nielson
, 187 Ill. 2d 271, 299, 718 N.E.2d 131, 148 (1999) (quoting 
People v. Lucas
, 132 Ill. 2d 399, 445, 548 N.E.2d 1003, 1022 (1989) (quoting 
People v. La Pointe
, 88 Ill. 2d 482, 501, 431 N.E.2d 344, 353 (1981) (quoting Webster’s Third New International Dictionary 1050 (1971)))).  Brutal conduct has been called “grossly ruthless,” “devoid of mercy or compassion,” and “cruel and cold-blooded.”  
Nielson
, 187 Ill. 2d at 299, 718 N.E.2d at 148 (quoting 
Lucas
, 132 Ill. 2d at 445, 548 N.E.2d at 1022 (quoting 
La Pointe
, 88 Ill. 2d at 501, 431 N.E.2d at 353 (quoting Webster’s Third New International Dictionary 286 (1971)))).  We find no need to elaborate on what the words 
brutal
 and 
heinous
 mean. 

We are mindful of the fact that it is hard to find a murder that does not possess some element of brutality, does not appear heinous in nature, and could not be said to show a degree of wanton cruelty to one’s fellow man.  Yet, certain murders stand apart from others when we think of these terms.  

Nitz repeatedly inflicted blows to the head of a downed and defenseless Miley, blows administered with a baseball bat.  An eyewitness estimated that he may have taken as many as 20 swings.  Nitz then stuffed Miley’s body into the trunk of his car.  He drove Miley to a remote destination, opened the trunk, and fired a bullet into Miley’s head.  To hamper future investigation and conceal his foul deeds, he severed the head from Miley’s body and disposed of it in parts unknown. 

When we think of what Louisville Slugger can do with a piece of white ash and we envision it employed as a weapon aimed at the skull of a listless young man, we might wonder about the bloody sight that it could produce and the degree of pain that it must have inflicted.  We might wonder how Nitz managed to fight fatigue, having taken the number of rips that he did.  We might wonder whether the badly beaten young man was still conscious when Nitz stuffed him into the trunk, whether he gasped for his last breaths of air while entombed in those surroundings, whether he felt relieved when the trunk opened and fresh air hit his lungs, and whether he knew his final moment was at hand when he saw the gun trained at his head.  While we might further ponder where the head of Michael Miley has come to rest, there is one thing over which we need not speculate–whether this crime fits the definition of brutal and heinous conduct indicative of wanton cruelty.  We find no abuse of discretion in the trial judge’s finding.

Nitz’s second attack on the life-imprisonment sentence points to mitigation evidence that failed to sway the trial judge from imposing the harshest sentence available.  The trial judge considered the mitigating evidence but rejected it, finding that Nitz lacked sufficient rehabilitative potential to warrant a mitigated sentence.  Thus, the judge did not veer from his judgment that Nitz should receive the most severe punishment at hand, despite hearing evidence that Nitz was emotionally and physically abused as a child, suffered from mild frontal-lobe brain damage, and had demonstrated finer human qualities at certain times during his life.  It was within the trial judge’s discretion to allow the seriousness of the offense to guide his decision in finding the proper punishment to impose.  His rejection of the factors in mitigation was not an abuse of discretion.

Finally, we are asked to determine whether the statutory mechanism for the imposition of the life sentence imposed in this case deprived Nitz of liberty without due process of law and of the right to have a jury determine those facts that set his limit of exposure to punishment.  The constitutional challenge focuses on the manner in which our law allows a sentencing judge to impose life’s duration as a prison term.  The first-degree-murder sentencing statute increases the maximum penalty that a sentencing judge can impose, based upon the judge’s determination that the killing was accompanied by brutal or heinous behavior indicative of wanton cruelty.  Life imprisonment, as opposed to a maximum prison term of 60 years, can be imposed if, but only if, the judge first finds that the murder was committed in an exceptionally brutal or heinous way.  We are asked to examine this sentencing scheme in light of 
Apprendi v. New Jersey
, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), a case in which the United States Supreme Court held a New Jersey hate-crime statute unconstitutional because it commissioned judges to make a factual finding that enhanced their power to punish beyond the maximum penalties prescribed for any given criminal offense.

In 1994, Charles Apprendi Jr. took his handgun and fired a spray of .22-caliber bullets into the home of his new neighbors.  Apparently, the newly arrived family did not fit Apprendi’s color criteria for living in a Vineland, New Jersey neighborhood.  Apprendi was indicted with numerous criminal offenses because of his misconduct, but none of them alleged that his actions were racially motivated.  
Apprendi
, 530 U.S. at ___, 147 L. Ed. 2d at 442, 120 S. Ct. at 2351.

Apprendi pleaded guilty to possession of a firearm for an unlawful purpose, an offense for which the New Jersey legislature enacted a 10-year maximum prison sentence.  
Apprendi
, 530 U.S. at ___, 147 L. Ed. 2d at 442-43, 120 S. Ct. at 2352.  However, a separate New Jersey hate-crime statute authorized the imposition of greater punishment for any crimes motivated by racial hatred.  
The trial judge found that Apprendi’s crime was so motivated and, because of that fact, sentenced Apprendi to a prison sentence greater than the 10-year maximum that could otherwise have been imposed.  
Apprendi
, 530 U.S. at ___, 147 L. Ed. 2d at 443, 120 S. Ct. at 2352.  

The Supreme Court, relying upon constitutional protections of due process, notice, and the right to a trial by jury, struck down the New Jersey hate-crime statute.  
Apprendi
, 530 U.S. at ___, 147 L. Ed. 2d at 442, 120 S. Ct. at 2351.  The Court took an exhaustive look at what our founding fathers promised when they bestowed the right to a trial by jury in all criminal cases.  It found that a part of that promise was the right to have a jury determine all facts necessary to a determination of the maximum punishment the law allows.  The Supreme Court handed down a constitutional-based rule when it stated, “Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury[] and proved beyond a reasonable doubt.”  
Apprendi
, 530 U.S. at ___, 147 L. Ed. 2d at 455, 120 S. Ct. at 2362-63. 

Here, the sentencing judge determined a fact that was not submitted to the jury–that this murder, as opposed to other first-degree murders, was accompanied by exceptionally brutal and heinous conduct indicative of wanton cruelty.  Based upon his finding as to the crime’s singular nature, the sentencing judge increased his maximum sentencing option from 60 years of imprisonment to imprisonment for life’s duration.  The State thus used the jury’s verdict, coupled with the sentencing judge’s finding, to obtain the maximum sentence prescribed by law for the offense of first-degree murder.   The  statutory mechanism employed spared the State from having to prove beyond a reasonable doubt that Nitz’s murder was committed in a particularly extreme way, set apart from other murders by its brutal and heinous nature. 

The sentencing provision at issue establishes two tiers of punishment for the crime of first-degree murder.  Section 5–8–1 of the Unified Code of Corrections provides as follows:

“(a) Except as otherwise provided in the statute defining the offense, a sentence of imprisonment for a felony shall be a determinate sentence set by the court under this Section, according to the following limitations:

(1) for first degree murder,

(a) a term shall be not less than 20 years and not more than 60 years, or

(b) if the court finds that the murder was accompanied by exceptionally brutal and heinous behavior indicative of wanton cruelty or, except as set forth in subsection (a)(1)(c) of this Section, that any of the aggravating factors listed in subsection (b) of Section 9-1 of the Criminal Code of 1961 are present, the court may sentence the defendant to a term of natural life imprisonment ***.”  730 ILCS 5/5-8-1(a) (West 1996).

The question of whether this sentencing scheme offends the constitution in the same manner that New Jersey’s hate-crime statute did has already been addressed by this court.  
People v. Beachem
, 317 Ill. App. 3d 693, 740 N.E.2d 389 (2000); 
People v. Joyner
, 317 Ill. App. 3d 93, 739 N.E.2d 594 (2000).  In 
Beachem
, a first district panel concluded that an extended-term 90-year prison sentence imposed under section 5-8-1, based upon the sentencing judge’s finding that the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty, violated the same constitutional provisions invoked by 
Apprendi
.  
Beachem
, 317 Ill. App. 3d at 708, 740 N.E.2d at 398-99.  The 
Beachem
 panel rejected an argument that the State urges us to adopt.  In 
Joyner
, a second district panel addressed the constitutionality of section 5-8-1(a)(1)(b) (730 ILCS 5/5-8-1(a)(1)(b) (West 1996)), the same sentencing provision at issue here.  
Joyner
, 317 Ill. App. 3d at 109, 739 N.E.2d at 605-06.  In light of the 
Apprendi
 ruling, the second district held that section 5-8-1(a)(1)(b) provided an unconstitutional method for the imposition of a life sentence.  
Joyner
, 317 Ill. App. 3d at 110, 739 N.E.2d at 606-07.  The court found that the provision impermissibly allows the imposition of a life sentence upon a factual finding reached by the sentencing judge rather than the defendant’s jury.  
Joyner
, 317 Ill. App. 3d at 110, 739 N.E.2d at 606-07.  It reasoned that the exceptionally egregious nature of the defendant’s conduct was a fact that the jury needed to determine and a fact that the State needed to prove beyond a reasonable doubt.  
Joyner
, 317 Ill. App. 3d at 110, 739 N.E.2d at 606-07.  The 
Joyner
 panel ruled without the benefit of the argument that the State raises here.  For that reason, the State urges us to depart from its decision.

The State also maintains that the 
Beachem
 panel rejected its argument without really addressing it and erroneously found that 60 years' imprisonment is the prescribed statutory maximum penalty for the crime of first-degree murder.  

Because our sentencing statutes authorize judges to make an array of factual findings that unleash greater punishment, we have been inundated with 
Apprendi
-based arguments challenging the validity of punishments imposed under those statutes.  The State’s counter to most of those arguments is similar to the position that it takes here.  Although the State’s view has found some acceptance, its legitimacy remains unsettled.  See 
People v. Sutherland
, No. 1-98-3802 (December 1, 2000) (where 
Apprendi
 was held inapplicable because section 5-8-4(a) criteria do not increase the sentence beyond the prescribed statutory maximum).  But see 
People v. Clifton
, Nos. 1-98-2126, 1-98-2384 (cons.) (September 29, 2000); 
People v. Carney
, 317 Ill. App. 3d 806, 740 N.E.2d 435 (2000).

The State’s argument draws upon the constitutional-based rule that emerges from the 
Apprendi
 decision, a rule expressed in the following words:

“Other than the fact of a prior conviction, any fact that increases the penalty for a crime 
beyond
 
the
 
prescribed
 
statutory
 
maximum
 must be submitted to a jury[,] and proved beyond a reasonable doubt.” (Emphasis added.) 
Apprendi
, 530 U.S. at ___, 147 L. Ed. 2d at 455, 120 S. Ct. at 2262-63.

Based upon this statement of principle, the State maintains that 
Apprendi
’s
 
dictate is not offended by how natural-life imprisonment is imposed under Illinois law.  The State takes the position that 
Apprendi
 stands for no more than what the stated rule declares.  It claims that if 
Apprendi
 means what it says, it
 only proscribes the use of nonjury factual determinations to increase a defendant’s sentence where the increase extends the criminal penalty beyond the prescribed statutory maximum sentence enacted for the offense charged.  Conversely, the State argues that 
Apprendi
 does not condemn sentences that remain within the maximum penalty that lawmakers have authorized judges to impose for a given offense.  The State concludes that any factor that varies the range of sentence can be assigned to a judge for determination so long as it is not a factor that authorizes an increase in punishment for a crime beyond the prescribed statutory maximum.  

The State asks the following question:  Under Illinois law, what is the prescribed maximum penalty for the crime of first-degree murder?  According to the State, this is the required inquiry and, if properly answered, places section 5-8-1(a)(1)(b) beyond 
Apprendi
’s reach.

We agree with the State that the simple answer to the question posed is death.  We also agree with the State that in noncapital cases, the maximum prescribed penalty for first-degree murder is natural-life imprisonment.  Notwithstanding, we cannot agree with the State’s conclusion that because Nitz’s life sentence does not exceed the maximum prescribed penalty for the offense of first-degree murder, it necessarily withstands constitutional challenge.   The State concludes that because the maximum noncapital penalty for first-degree murder is natural-life imprisonment, and because the sentencing judge imposed a sentence that did not exceed the maximum prescribed penalty for the offense charged,
 the procedure employed in the imposition of Nitz’s life sentence afforded due process of law and all jury determinations to which Nitz was constitutionally entitled.  In support of its conclusion, the State emphasizes that the legislature clearly empowered courts to impose a life sentence upon any person who committed first-degree murder in a particularly brutal or heinous manner.  The State argues that the language “not more than sixty years” contained in section 5-8-1(a) does not set a maximum penalty but merely states the high range of a lesser tier of punishment.  Section 5-8-1(a) exists to limit sentencing discretion to a range of lesser penalties in those cases where the aggravating “sentencing factors” contained in section 5-8-1(a)(1)(b) do not exist.  Thus, the State views the two-tiered sentencing scheme as a method of limitation rather than enhancement.  Based upon this view, it argues that the trial judge did not impermissibly enhance Nitz’s sentence.  The trial judge merely determined that this was not the type of unremarkable first-degree murder that would limit his sentencing range to punishment’s first tier.

This position conforms to the language that Justice Stevens chose to use when he drafted 
Apprendi’s
 constitutional imperative.  It follows from this construct that Nitz’s sentence would not suffer the constitutional infirmity that infected Apprendi’s sentence.  Apprendi was punished 
beyond
 
the
 
maximum
 10-year sentence established
 for the crime that he had committed.  But Nitz was only punished 
with the prescribed statutory maximum sentence
 for first-degree murder, a penalty no more severe than what the law allowed for when Nitz committed the crime.

By focusing upon the precise wording of one sentence among many that comprise the 
Apprendi
 ruling, we could greatly simplify our task.  Such a focus would free us from an encounter with the broader constitutional message that a reading of the entire decision yields.  The State acknowledges that another message lurks behind the rule’s wording, a message that the State has referred to as the other 
Apprendi
 ruling. 

The 
Apprendi
 decision cannot be read in isolation.  When read in conjunction with the case that foreshadowed it, the basic premise of the State’s argument is drawn into question.  The State, of necessity, assumes that the language used to state the rule was 
designed to limit its application to the rare circumstance that befell Apprendi, where a separate hate-crime statute empowered Apprendi’s sentencing judge to punish beyond the prescribed maximum sentence already established for his offense.  While the words used in the holding were necessary in order to align the ruling with Apprendi’s circumstance, they were not intended to narrowly confine the constitutional protection to only those criminal defendants sentenced under statutes that enhance punishment beyond a prescribed statutory maximum.  This conclusion finds clear support in a reading of the entire paragraph that contains the sentence relied upon by the State.  When we examine the three sentences that make up that paragraph, we find that the two sentences that bracket the rule are critical to an understanding of the message that Justice Stevens was trying to convey.  We immediately discover the importance of reading 
Apprendi
 in light of its harbinger, 
Jones v. United
 
States
, 526 U.S. 227, 143 L. Ed. 2d 311, 119 S. Ct. 1215 (1999).  Justice Stevens wrote:

“In sum, our reexamination of our cases in this area, and of the history upon which they rely, 
confirms the opinion that we expressed in Jones
.  Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury[,] and proved beyond a reasonable doubt.  With that exception, we 
endorse the statement of the rule set forth in the concurring opinions in [the Jones] case: ‘[I]t is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed.
’ ” (Emphasis added.)  
Apprendi
, 530 U.S. at ___, 147 L. Ed. 2d at 455, 120 S. Ct. at 2262-63 (quoting 
Jones
, 526 U.S. at 252-53, 143 L. Ed. 2d at 332, 119 S. Ct. at 1228 (Stevens, J., concurring)).

We cannot see how Justice Stevens could have intended the limitation that the State suggests and, in the next breath, couple his narrowly confined rule to an endorsement of what he had to say in 
Jones
.  It is simply not possible.  By coupling Apprendi’s circumstance to the circumstance confronted by Jones and to the views he expressed in addressing the federal statute struck down in 
Jones
. Justice Stevens necessarily extended the constitutional rule to statutes other than those limited statutes whose enhancement schemes permit penalty increases beyond prescribed statutory maximum penalties.  Jones’s sentence was struck down even though it did not exceed the prescribed statutory maximum.  In light of the nature of the sentencing statute at issue in 
Jones
 and the mechanism that it employed to enhance Jones’s sentence, the decision in 
Jones
 suggests that due process and the right to a trial by jury are constitutional guarantees that various sentencing schemes can offend, depending upon how a legislature unleashes the power to punish for a given offense and whether that power is constrained in the absence of additional factual findings.  The required factual findings do not have to increase penalties beyond the prescribed statutory maximum, as was the case with 
Apprendi
.  The fact removed from jury consideration merely has to increase the prescribed range of penalties to which a criminal defendant is exposed.

Jones 
is particularly instructive, because the federal statute at issue was structured in a fashion closely akin to many of the Illinois sentencing statutes now under 
Apprendi
 attack, including the statute at issue here.  The federal statute threatened a maximum penalty of 15 years' imprisonment for the offense of “carjacking.”  The statute also provided that if “serious bodily injury” occurred during the course of the carjacking, the offender would be subject to imprisonment for up to 25 years.  If death occurred during the course of the crime, the offender was subject to life imprisonment.  
Jones
, 526 U.S. at 230, 143 L. Ed. 2d at 318, 119 S. Ct. at 1218.  Whether serious bodily injury or death occurred during the course of the carjacking were not facts assigned to the jury for decision.  Congress wanted the sentencing judge to decide the existence of serious bodily injury or death as “sentencing factors” 
that opened the way to higher punishment ranges.  This tiered approach to punishment, hinged upon facts assigned to the sentencing judge for determination, formed the constitutional question addressed by the Supreme Court.  
Jones
, 526 U.S. at 231-32, 143 L. Ed. 2d at 319, 119 S. Ct. at 1218-19. 

Jones was convicted of federal carjacking.  
Jones
, 526 U.S. at 231, 143 L. Ed. 2d at 318, 119 S. Ct. at 1218.  The sentencing judge determined that one of the victims of the carjacking had sustained a perforated eardrum during the course of the crime, and based upon a finding of serious bodily injury, the judge sentenced Jones to a 25-year prison term.  
Jones
, 526 U.S. at 231, 143 L. Ed. 2d at 318-19, 119 S. Ct. at 1218.  Thus, Jones’s sentence was not enhanced beyond the prescribed statutory maximum.  Jones received the prescribed statutory maximum of 25 years, a sentence no more severe than the law allowed for when Jones committed the crime. 

The Supreme Court framed the issue as follows:

“This case turns on whether the federal carjacking statute *** defined three distinct offenses or a single crime with a choice of three maximum penalties, two of them dependent on sentencing factors exempt from the requirements of charge and jury verdict.”  
Jones
, 526 U.S. at 229, 143 L. Ed. 2d at 317, 119 S. Ct. at 1217. 

The Court was called upon to examine the distinction between a sentencing factor and an element of an underlying offense.  
Jones
, 526 U.S. at 232, 143 L. Ed. 2d at 319, 119 S. Ct. at 1219.  It found that the carjacking statute established separate offenses by the specification of distinct elements.  As such, the infliction of severe bodily injury was an element that had to be “charged by indictment, proven beyond a reasonable doubt, and submitted to a jury for its verdict.”  
Jones
, 526 U.S. at 252, 143 L. Ed. 2d at 331, 119 S. Ct. at 1228.

The confirmation and endorsement of 
Jones
 by the 
Apprendi
 majority enlightens the central premise of the constitutional rule–it is wrong to convict someone of one crime and sentence them for another.  Laws that allow for it erode the value of the right to a trial by jury.  
The Supreme Court addressed this in 
Jones
:
 
 

“If a potential penalty might rise from 15 years to life on a nonjury determination, the jury’s role would correspondingly shrink from the significance usually carried by determinations of guilt to the relative importance of low-level gatekeeping: in some cases, a jury finding of fact necessary for a maximum 15-year sentence would merely open the door to a judicial finding sufficient for life imprisonment.  It is therefore no trivial question to ask whether recognizing an unlimited legislative power to authorize 
determinations
 
setting
 
ultimate
 
sentencing
 
limits
 
without
 
a jury
 would invite erosion of the jury’s function to a point against which a line must necessarily be drawn.” (Emphasis added.)  
Jones
, 526 U.S. at 243-44, 143 L. Ed. 2d at 326, 119 S. Ct. at 1224.

With this in mind, we address the question of whether 
Apprendi
’s
 
constitutional rule was meant to apply where the maximum prescribed penalty established for a given crime is a penalty that cannot be imposed unless a judge first makes an additional 
required
 finding of fact beyond those facts that the jury determined in the return of a guilty verdict.  We examine this question under the facts of this case, where the trial judge found that Nitz committed a different kind of murder, one that set his crime apart from other first-degree murders and increased his exposure to punishment.

We believe that the sentencing mechanism used to impose life imprisonment in this case offends the constitution in a manner that the United States Supreme Court intended to proscribe.  The statutory machinery employed impermissibly violated the constitutional protections afforded by the due process clause and the sixth amendment’s guarantee to a jury trial. 

A proper determination of the constitutionality of our first-degree-murder sentencing scheme requires a look at the 
effect
 of the sentencing judge’s finding of fact.  When we examine the machinery for the imposition of a life sentence, we need to ask:  What was the most severe punishment the law allowed the trial judge to impose, absent his finding that Nitz killed Miley in a brutal and heinous manner indicative of wanton cruelty?  Justice Stevens explains why this question is important to the promise of a trial by jury: “[T]he relevant inquiry is not one of form, but of effect–does the required finding expose the defendant to a greater punishment than that authorized by the jury’s guilty verdict?”  
Apprendi
, 530 U.S. at ___, 147 L. Ed. 2d at 457, 120 S. Ct. at 2365.   When this inquiry is made, its answer compels a conclusion that 
our legislature has designed a method for imposing life imprisonment in certain cases of first-degree murder that offends the constitution. 

While our legislature clearly authorized the imposition of natural-life imprisonment in certain exceptional cases of first-degree murder, it did not permit the imposition of a life sentence based solely upon the facts determined by a jury in arriving at its guilty verdict.  The findings of fact left for a jury in accordance with the State’s burden of proof do not include the finding of fact required to impose a life sentence.  Judges cannot impose a life sentence under our Unified Code of Corrections based upon the findings of fact that make up the jury’s guilty verdict.  To increase the sentencing range from the 20-to-60-year range set forth in section 5-8-1(a)(1)(a), the sentencing judge must first find an additional fact, not decided by the jury.  Without the required additional finding, the judge is constrained by law to impose a sentence no more severe than imprisonment for 60 years.  Hence, a 60-year prison term is the most punishment to which an accused is exposed on the facts assigned to the jury for determination.  A 60-year prison term is the maximum sentence prescribed by law for those facts that define the crime of first-degree murder.  Those are the facts that are submitted to a jury for determination, facts that must measure up to a reasonable doubt standard of proof before the State has the right to impose any form of punishment. 

Thus, the permanent loss of freedom is a potential penalty for committing first-degree murder.  However, its actual imposition as a punishment turns upon a fact that a state officer is empowered to decide, rather than a jury.  The promise of a trial at which facts are determined by fellow citizens rather than state officers or government officials cannot abide such a scheme.  Justice Scalia, in an answer to the 
Apprendi
 dissent, provides the simple reason when he explains what the right to trial by jury guarantees:

“What ultimately demolishes the case for the dissenters is that they are unable to say what the right to trial by jury 
does
 guarantee if, as they assert, it does not guarantee–what it has been assumed to guarantee throughout our history–
the right to have a jury determine those facts that determine the maximum sentence the law allows.
” (Latter emphasis added.)  
Apprendi
, 530 U.S. at ___, 147 L. Ed. 2d at 460, 120 S. Ct. at 2367 (Scalia, J., specially concurring).

We adhere to Justice Scalia’s view of what the right to a trial by jury has historically guaranteed and, therefore, must 
continue to guarantee–the right to have a jury determine those facts that determine the maximum sentence that the law will allow.  After a jury determines the facts that fix the limit of exposure to punishment, judges are free to consider a wide range of factors to determine whether the maximum punishment should be imposed. 

The effect of the trial judge’s factual finding under section 5-8-1(a)(1)(b) was to expose Nitz to a greater punishment than that authorized by the jury’s guilty verdict.  Natural-life imprisonment was therefore imposed in violation of the constitutional right to a trial by jury.  Because Nitz was unlawfully sentenced to life imprisonment and because the trial judge’s sentencing findings are quite clear as to the type of sentence Nitz deserves, we will exercise our authority under Supreme Court Rule 615(b)(4) (134 Ill. 2d R. 615(b)(4)) and modify the sentence to a 60-year determinate term of imprisonment, the maximum sentence the law allows us to impose on those facts decided by the jury that weighed Nitz’s guilt, the maximum sentence for the crime that 12 fellow citizens determined Nitz to have committed.

The following text is nonpublishable under Supreme Court Rule 23.]

The State asks us to resurrect Nitz’s first conviction, which was based upon a jury determination that this was a felony murder.  The State’s argument would have us ignore the legal effect of the Illinois Supreme Court’s reversal of Nitz’s conviction.  Once the prior guilty verdict was set aside and the sentence was vacated, there was nothing left.  See 
People v. Rea
, 80 Ill. App. 3d 77, 80, 399 N.E.2d 302, 304 (1979); 
People v. Jackson
, 223 Ill. App. 3d 331, 334, 584 N.E.2d 836, 838-39 (1991).  We cannot say why the State decided to change the theory of its prosecution or why it chose not to pursue the death penalty when these proceedings started anew.  We can say that all options were available to it when the supreme court nullified its earlier efforts.  The State is now entitled to punish Nitz only for his guilt as determined by this jury, guilt decided on different prosecutorial theories than those presented at the first trial. 

[The preceding text is nonpublishable under Supreme Court Rule 23.]

For the foregoing reasons, we affirm the judgment of conviction but modify the sentence of natural-life imprisonment to 60 years’ imprisonment.  

Affirmed as modified.

WELCH and GOLDENHERSH, JJ., concur.

NO. 5-98-0657

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

___________________________________________________________________________________

THE PEOPLE OF THE STATE OF ILLINOIS, )  Appeal from the

)  Circuit Court of

     Plaintiff-Appellee, )  Williamson County.

)

)  No. 88-CF-162

)

RICHARD C. NITZ, )  Honorable 

)  John Speroni,

     Defendant-Appellant. )  Judge, presiding.

___________________________________________________________________________________

Opinion Filed
: March 28, 2001

___________________________________________________________________________________

Justices
: Honorable Clyde L. Kuehn, J.

Honorable Thomas M. Welch, J., and

Honorable Richard P. Goldenhersh, J.,

Concur

___________________________________________________________________________________

Attorneys
 Daniel M. Kirwan, Deputy Defender, Rita K. Peterson, Assistant Defender, Office

for
 of the State Appellate Defender, Fifth Judicial District, Route 15 East, P.O. Box

Appellant
 2430, Mount Vernon, IL 62864-0047

___________________________________________________________________________________

Attorneys
 Hon. Charles Garnati, State's Attorney, Williamson County Courthouse, Marion, 

for
 IL 62959; Norbert J. Goetten, Director, Stephen E. Norris, Deputy Director, Kendra

Appellee
 S. Mitchell, Staff Attorney, Office of the State's Attorneys Appellate Prosecutor,

Route 15 East, P.O. Box 2249, Mount Vernon, IL 62864

___________________________________________________________________________________

COMMENTS AND ANNOTATIONS
Text Box 1:

TEXT BOXES
NOTICE

Decision filed 03/28/01.  The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.