Docket No. 99712.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant and Cross- Appellee, v. RICHARD C. NITZ, Appellee and Cross-Appellant.

*Opinion filed April 20, 2006.*

JUSTICE GARMAN delivered the judgment of the court, with opinion.

Chief Justice Thomas and Justices Freeman, McMorrow, Fitzgerald, and Karmeier concurred in the judgment and opinion.

Justice Kilbride specially concurred, with opinion.


**OPINION**

In the second trial in this case, a jury in the circuit court of Williamson County convicted defendant of first degree murder. Ill. Rev. Stat. 1987, ch. 38, par. 9–1. The circuit judge found that defendant's crime was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty. Ill. Rev. Stat. 1987, ch. 38, par. 1005–8–1(a). Based on this finding, the trial court sentenced defendant to life imprisonment. Ill. Rev. Stat. 1987, ch. 38, par. 1005–8–1(a). The appellate court affirmed defendant's conviction, but modified his sentence to a 60-year prison term. *People v. Nitz*, 319 Ill. App. 3d 949, 969 (2001). We directed the appellate court to reconsider its decision. *People v. Nitz*, 206 Ill. 2d 637 (2003) (supervisory order). It did so, affirming defendant's life sentence in an unpublished order. *People v. Nitz*, No. 5–98–0657 (2004) (unpublished order under Supreme Court Rule 23). We then directed the appellate court to issue a single published opinion or unpublished order disposing of all issues in defendant's appeal. *People v. Nitz*, 209 Ill. 2d 594 (2004) (supervisory order). In doing so, the appellate court again modified defendant's sentence to a 60-year prison term. 353 Ill. App. 3d 978, 1005. We granted the State's petition for leave to appeal. 177 Ill. 2d R. 315. The defendant requested cross-relief. We now reverse the judgment of the appellate court in part, and affirm the judgment of the circuit court.

## I. BACKGROUND

Defendant was originally convicted in 1988 of the first degree murder of Michael Miley. He was sentenced to death by the circuit court of Williamson County. This court affirmed his conviction and death sentence. *People v. Nitz*, 143 Ill. 2d 82 (1991). This court later reversed the trial court's dismissal of defendant's postconviction petition and remanded the cause for a new trial. *People v. Nitz*, 173 Ill. 2d 151 (1996). In 1998, defendant was again convicted of first degree murder in this case. Evidence presented at trial indicated that defendant struck Miley repeatedly in the head with a baseball bat, shot him, and severed Miley's head in an attempt to conceal the ballistics evidence. The applicable first degree murder statute read as follows:

"(a) A person who kills an individual without lawful justification commits first degree murder if, in performing the acts which cause the death:

(1) He either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or

(2) He knows that such acts create a strong probability of death or great bodily harm to that individual or another[.]" Ill. Rev. Stat. 1987, ch. 38, par. 9–1.

The jury received three different sets of verdict forms, each addressing a different way that a defendant may commit the offense of first degree murder. The jury found defendant not guilty of killing Miley with the intent to kill or do great bodily harm. It also found defendant not guilty of killing Miley with the knowledge that his acts would cause death or great bodily harm. However, the jury found defendant guilty of killing Miley with the knowledge that his acts created a strong probability of death or great bodily harm.

The trial court sentenced defendant to life imprisonment after the trial judge found that defendant's crime was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty. Section 5–8–1(a) of the Unified Code of Corrections provided the statutory basis for this sentence:

"(a) Except as otherwise provided in the statute defining the offense, a sentence of imprisonment for a felony shall be a determinate sentence set by the court under this Section, according to the following limitations:

(1) for first degree murder, (a) a term shall be not less than 20 years and not more than 60 years, or (b) if the court finds that the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty ***, the court may sentence the defendant to a term of natural life imprisonment ***." Ill. Rev. Stat. 1987, ch. 38, par. 1005–8–1(a).

The appellate court affirmed the trial court's verdict. *Nitz*, 319 Ill. App. 3d 949. However, it reduced defendant's sentence

˘3˘

to a 60-year prison term. *Nitz*, 319 Ill. App. 3d at 969. The appellate court based this reduction on *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000). The *Apprendi* Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490, 147 L. Ed. 2d at 455, 120 S. Ct. at 2362-63. In this case, the trial court increased defendant's sentence based on the fact that defendant's crime was accompanied by exceptionally brutal or heinous conduct indicative of wanton cruelty. The trial judge, rather than a jury, made this factual finding. The appellate court held that basing defendant's life sentence on a judge-made finding violated the holding of *Apprendi*. *Nitz*, 319 Ill. App. 3d at 969. The court reduced defendant's sentence to the maximum sentence authorized upon the facts determined by the trial jury. *Nitz*, 319 Ill. App. 3d at 969.

In the exercise of this court's supervisory authority, we directed the appellate court to vacate its judgment and reconsider its decision in light of *People v. Crespo*, 203 Ill. 2d 335 (2001), *People v. Thurow*, 203 Ill. 2d 352 (2003), *People v. Swift*, 202 Ill. 2d 378 (2002), and *People v. Kaczmarek*, 207 Ill. 2d 288 (2003). *People v. Nitz*, 206 Ill. 2d 637 (2003) (supervisory order). These cases trace the development of this court's approach to *Apprendi* errors. In *Swift*, we held that facts taking a sentence for first degree murder above the sentencing range of 20 to 60 years' imprisonment must be found by a jury beyond a reasonable doubt. *Swift*, 202 Ill. 2d at 392. Although we vacated the *Swift* defendant's extended-term sentence, we have since established that an *Apprendi* error does not necessarily require resentencing. Rather, the doctrines of harmless error (*Thurow*, 203 Ill. 2d at 368) and plain error (*Crespo*, 203 Ill. 2d at 347) apply. In *Kaczmarek,* we applied plain-error review to affirm a murder defendant's life sentence imposed in violation of *Apprendi*, concluding that a jury would have found that the crime was committed in a brutal and heinous manner indicative of wanton cruelty. *Kaczmarek*, 207 Ill. 2d at 303-04.

In response to our supervisory order, the appellate court issued an unpublished order finding the *Apprendi* error to have been harmless beyond a reasonable doubt. *People v. Nitz,* No. 5–98–0657 (2004) (unpublished order under Supreme Court Rule 23). This order, however, failed to vacate the appellate court's previous judgment, and failed to address the other issues covered by the court's opinion.

We then issued a second supervisory order, directing the appellate court to issue a single published opinion or unpublished order disposing of all issues in defendant's appeal. *People v. Nitz*, 209 Ill. 2d 594 (2004) (supervisory order). Rather than merging its previously issued judgments, the appellate court ordered the parties to submit supplemental briefs in light of the United States Supreme Court's opinion in *Blakely v. Washington*, 542 U.S. 296, 159 L. Ed. 2d 403, 124 S. Ct. 2531 (2004). Specifically, it asked the parties to address the following question: "[D]oes the United States Supreme Court's recent pronouncements [*sic*] about the meaning of *Apprendi* cast doubt upon the continued viability of our Supreme Court's holdings that harmless-error analysis can be applied to jury verdicts that did not reflect a fact necessary to a given punishment?"

After briefing was complete, the appellate court filed a single published opinion. 353 Ill. App. 3d 978. The opinion affirmed defendant's conviction, applying the same rationale as the original appellate opinion. 353 Ill. App. 3d at 980-91; see also *Nitz*, 319 Ill. App. 3d 949. However, the new opinion's treatment of the *Apprendi* issue differed markedly.

The new opinion noted that, in the years since defendant's case was first appealed, this court has established that the sentencing scheme applied to defendant does not comport with the right to trial by jury as construed in *Apprendi*. 353 Ill. App. 3d at 993; see also *People v. Swift*, 202 Ill. 2d 378, 383 (2002). Thus, the appellate court did not revive its original analysis on that issue. 353 Ill. App. 3d at 993. Instead, the court turned its attention to the proper remedy for an *Apprendi* violation. It attempted to analyze the views of individual United States Supreme Court justices, as reflected by the shifting composition of majorities and dissenters in the Court's cases

concerning the right to a jury trial under the sixth amendment to the United States Constitution. 353 Ill. App. 3d at 996-1001. Based in part on language in *Blakely* that emphasized the fundamental nature of the right to a jury, the appellate court concluded that the dissenting opinion in *Neder v. United States*, 527 U.S. 1, 144 L. Ed. 2d 35, 119 S. Ct. 1827 (1999), now reflected the views of a majority of the Court. 353 Ill. App. 3d at 1000. In *Neder*, the majority held that failing to submit an element of a crime for the jury's deliberation was subject to harmless-error analysis. *Neder*, 527 U.S. at 15-16, 144 L. Ed. 2d at 51, 119 S. Ct. at 1837. The dissent argued that this violation was a structural error that could never be harmless. *Neder*, 527 U.S. at 30, 144 L. Ed. 2d at 60, 119 S. Ct. at 1844 (Scalia, J., concurring in part and dissenting in part, joined by Souter and Ginsburg, JJ.). The appellate court noted that this court relied on *Neder* when determining that harmless-error analysis applies to an *Apprendi* violation. 353 Ill. App. 3d at 1002; see also *Thurow*, 203 Ill. 2d at 371. It concluded that, absent a decision by a higher court expressly overruling *Neder* or *Thurow*, the appellate court was bound by *Thurow* to apply a harmless-error analysis to defendant's case. 353 Ill. App. 3d at 1002.

In applying that analysis, however, the appellate court determined that it should not use an objective standard when determining whether a jury would have found defendant's crime to be brutal and heinous. 353 Ill. App. 3d at 1002. Rather, it concluded that defendant "was constitutionally entitled to have each element of his guilt decided beyond a reasonable doubt by a *jury of his choosing.*" (Emphasis in original.) 353 Ill. App. 3d at 1003. Thus, the appellate court considered "what Nitz's jury, not some hypothetical jury, would have decided had it been allowed to decide." 353 Ill. App. 3d at 1003.

The court noted that the jury in this case was presented with three different verdict forms reflecting three different ways in which defendant could be guilty of first degree murder. 353 Ill. App. 3d at 1003. Given that choice, the jury found defendant guilty of "killing Miley while acting with a state of mind generally deemed the least culpable *mens rea* to accompany murderous

acts that cause another person's death." 353 Ill. App. 3d at 1003. The appellate court concluded that because the jury acquitted defendant of the two "more reprehensible" murder counts, it could not say that the jury would have unanimously decided the killing was accompanied by brutal or heinous behavior indicative of wanton cruelty. 353 Ill. App. 3d at 1004.

The appellate court further considered the length of the jury deliberations and the fact that defense counsel noted for the record that four jurors were crying in the courtroom. 353 Ill. App. 3d at 1004. It also considered a juror affidavit which stated that four jurors did not think the prosecution proved defendant guilty beyond a reasonable doubt. 353 Ill. App. 3d at 1004. The affiant juror stated that she signed the "least culpable" verdict form only because she believed defendant would receive a lenient sentence. 353 Ill. App. 3d at 1004. Based on this information, the appellate court concluded that the jury had reached a compromise verdict. 353 Ill. App. 3d at 1004. The court decided that the four alleged hold-out jurors would not have agreed to the more serious finding that defendant's crime was accompanied by brutal or heinous behavior indicative of wanton cruelty. 353 Ill. App. 3d at 1004-05. Thus, the court concluded that the *Apprendi* error was not harmless beyond a reasonable doubt, and resentenced defendant to a 60-year prison term. 353 Ill. App. 3d at 1005.

We allowed the State's petition for leave to appeal. 177 Ill. 2d R. 315. In this opinion, we first address the proper analysis with which to review defendant's sentence. Second, we consider the merits of the sentencing issue. Finally, we address defendant's request for cross-relief. The facts of defendant's case are set forth in our first opinion (*Nitz*, 143 Ill. 2d 96) and will be included below only as they are relevant to the issues raised in this appeal.

## II. PLAIN ERROR

At the outset, there is no question that defendant's sentence violates *Apprendi*. We have already established that the only permissible sentence for first degree murder based on an ordinary jury verdict of guilt is 20 to 60 years' imprisonment.

*Swift*, 202 Ill. 2d at 392. Facts which take a sentence above this range must be found by a jury beyond a reasonable doubt, including the fact that a crime was brutal or heinous. *Swift*, 202 Ill. 2d at 392. Thus, the trial court violated *Apprendi* when it imposed defendant's life sentence based on the judge's finding that defendant's crime was brutal or heinous and indicative of wanton cruelty.

However, we have determined that this sort of violation does not necessarily invalidate a defendant's sentence. In *Thurow*, we considered the appropriate remedy for an *Apprendi* error. The trial judge in *Thurow* increased the defendant's sentence based on a judge-made finding that the victim was a member of the defendant's household. *Thurow*, 203 Ill. 2d at 354. The defendant properly objected to this process as an *Apprendi* violation. *Thurow*, 203 Ill. 2d at 363. We determined that harmless-error analysis applies to an *Apprendi* violation when the defendant has made a timely objection. *Thurow*, 203 Ill. 2d at 363. However, when a defendant has failed to object to an error, plain-error analysis applies. *Thurow*, 203 Ill. 2d at 363. The difference, we noted, lies in the burden of proof. Under a harmless-error analysis, the State must prove beyond a reasonable doubt that the result would have been the same absent the error. *Thurow*, 203 Ill. 2d at 363. Under plain-error analysis, the defendant must persuade the court that the error was prejudicial. *Thurow*, 203 Ill. 2d at 363.

Following *Thurow*, we applied plain-error analysis to *Apprendi* violations in *Crespo* (203 Ill. 2d at 347) and *Kaczmarek* (207 Ill. 2d at 302). In *Crespo*, as in the instant case, the defendant's extended term sentence for first degree murder was based on a posttrial finding by the circuit court that the crime was committed in a both brutal and heinous manner indicative of wanton cruelty. *Crespo*, 203 Ill. 2d at 346. We determined that a jury would have reached the same conclusion when considering the undisputed evidence that defendant stabbed his victim 24 times and ripped out a large chunk of her scalp. *Crespo*, 203 Ill. 2d at 348-49. Thus, we concluded that the defendant failed to show the *Apprendi* error was prejudicial, and affirmed his extended-term sentence.

*Crespo*, 203 Ill. 2d at 348-49. In *Kaczmarek*, we again determined that a defendant did not warrant resentencing, even though he received an extended-term sentence based on a judge's finding that the crime was brutal and heinous. *Kaczmarek*, 207 Ill. 2d at 302. Examining evidence that the defendant beat, stabbed, and strangled an 86-year-old woman, we held that his conduct undoubtedly qualified as both exceptionally brutal and heinous. *Kaczmarek*, 207 Ill. 2d at 303. Thus, the defendant could not show he was prejudiced by the *Apprendi* error. *Kaczmarek*, 207 Ill. 2d at 302.

In the instant case, defendant did not make a timely objection to the extended-term sentence he received based on the trial judge's finding that his conduct was brutal or heinous. Thus, plain-error analysis applies to a review of his sentence. *Thurow*, 203 Ill. 2d at 363; *Crespo*, 203 Ill. 2d at 347; *Kaczmarek*, 207 Ill. 2d at 302. The appellate court erred by applying harmless-error analysis.

In addition to ignoring the plain-error analysis of *Crespo* and *Kaczmarek*, the appellate court's opinion indicates that it applied even harmless-error analysis begrudgingly. See 353 Ill. App. 3d at 1002 ("we firmly believe that a majority of the justices on today's United States Supreme Court would never allow the harmless error analysis that we are about to engage in"). Based in part on the Court's statements in *Blakely* concerning the fundamental nature of the right to a jury, the appellate court contended that an *Apprendi* violation constitutes structural error that can be remedied only by resentencing. 353 Ill. App. 3d at 995-1001, citing *Blakely v. Washington*, 542 U.S. 296, 159 L. Ed. 2d 403, 124 S. Ct. 2531 (2004). Defendant relies on *Blakely* to make a similar argument before this court. The State responds that the United States Supreme Court sanctioned the use of plain-error and harmless-error review in *Apprendi* cases by its opinion in *United States v. Booker*, 543 U.S. 220, 160 L. Ed. 2d 621, 125 S. Ct. 738 (2005).

In *Booker*, the Court held that the United States "Sentencing Guidelines" violated the sixth amendment, as interpreted in *Apprendi*, by mandating certain sentences based on judicial fact-finding. *Booker*, 543 U.S. at 226-27, 160 L. Ed.

2d at 639, 125 S. Ct. at 746. The Court in *Blakely* had reached a similar conclusion about a sentencing scheme at the state level. *Blakely,* 542 U.S. at 305, 159 L. Ed. 2d at 414-15, 124 S. Ct. at 2538. Relevant to this case, however, is the *Booker* Court's discussion of the consequences of applying its decision to all cases on direct review:

> "[The retroactivity of *Booker*] does not mean that we believe that every sentence gives rise to a Sixth Amendment violation. Nor do we believe that every appeal will lead to a new sentencing hearing. That is because we expect reviewing courts to apply ordinary prudential doctrines, determining, for example, whether the issue was raised below and whether it fails the 'plain-error' test. It is also because, in cases not involving a Sixth Amendment violation, whether resentencing is warranted or whether it will instead be sufficient to review a sentence for reasonableness may depend upon application of the harmless-error doctrine." *Booker*, 543 U.S. at 268, 160 L. Ed. 2d at 665, 125 S. Ct. at 769.

Thus, *Booker* establishes that it is appropriate to apply the doctrines of plain error and harmless error to sentences that violate *Apprendi*. This aligns with our decisions to apply harmless-error review when a defendant has timely objected to an *Apprendi* error and plain-error review when a defendant has not objected. See *Thurow*, 203 Ill. 2d at 363; *Crespo*, 203 Ill. 2d at 347; *Kaczmarek*, 207 Ill. 2d at 302. Accordingly, we reject defendant's contention that the *Apprendi* error in this case is structural.

After the appellate court first erred by applying harmless-error review instead of plain-error review, it compounded this error by creating a new and unprecedented harmless-error analysis. In *Thurow*, we held that a court reviewing a claim of harmless error should ask: " 'Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?' " *Thurow*, 203 Ill. 2d at 368-69, quoting *Neder*, 527 U.S. at 18, 144 L. Ed. 2d at 53, 119 S. Ct. at 1838. We answered this question in the affirmative in *Thurow* because of the uncontested and overwhelming evidence that

supported the finding made by the judge. *Thurow*, 203 Ill. 2d at 369; see also *Kaczmarek*, 207 Ill. 2d at 302 ("[i]t is *** clear, after *Thurow* and *Crespo*, that an *Apprendi* violation of this kind will not warrant resentencing where there is overwhelming evidence that the crime was committed in a brutal and heinous manner indicative of wanton cruelty"); *People v. Jones*, 219 Ill. 2d 1, ___ (2006) (finding *Apprendi* violation to be harmless error where State presented uncontested and overwhelming evidence of fact found by judge). However, the appellate court in this case did not examine the evidence to determine what a rational jury would have found. Instead, the appellate court reviewed the behavior of the actual jury and speculated as to the motivations of the 12 men and women empaneled to decide defendant's case.

It is extremely difficult for a reviewing court to read a jury's subjective thoughts. See *Preston v. Simmons*, 321 Ill. App. 3d 789, 800 (2001); *People v. Pankey*, 58 Ill. App. 3d 924, 927 (1978); see also *Yates v. Evatt*, 500 U.S. 391, 404-05, 114 L. Ed. 2d 432, 449, 111 S. Ct. 1884, 1893 (1991) (noting that harmless-error inquiry "cannot be a subjective one into the jurors' minds"), overruled on other grounds by *Estelle v. McGuire*, 502 U.S. 62, 72 n.4, 116 L. Ed. 2d 385, 399 n.4, 112 S. Ct. 475, 482 n.4 (1991). Accordingly, the test for harmless error does not ask a reviewing court to undertake this impossible task. Rather, *Thurow* establishes that an appellate court reviewing an *Apprendi* error must examine the evidence and determine what a rational jury would have found. *Thurow*, 203 Ill. 2d at 368-69. We have recognized the tension between this responsibility and the *Apprendi* Court's holding that it is unconstitutional for a judge and not a jury to make a factual finding that increases the penalty for a crime beyond the prescribed statutory maximum. *Thurow*, 203 Ill. 2d at 369. "[I]n applying harmless-error analysis here," we noted in *Thurow*, "we are engaging in the very practice that *Apprendi* forbids: we, as judges, are making the factual determination that [the victim] was a member of defendant's household." *Thurow*, 203 Ill. 2d at 369-70. Our acknowledgment in *Thurow* of the tension inherent in this process emphasizes the proper task of the reviewing court. An appellate court cannot escape this task by

purporting to read the minds of the trial jurors. Thus, the appellate court in this case erred when it failed to examine the evidence presented at trial and instead attempted to divine the thoughts of the 12 jurors who heard that evidence.

In sum, we reaffirm the holdings of *Thurow*, *Crespo*, and *Kaczmarek* that plain-error review applies to *Apprendi* errors to which the defendant has not timely objected, while harmless-error analysis applies when the defendant has objected to the error. We therefore hold that plain-error review is the appropriate standard in this case. To execute either analysis, a reviewing court must examine the evidence adduced at trial and determine objectively whether a rational jury would have made the finding in question.

## III. DEFENDANT'S SENTENCE

Having determined that plain-error analysis is appropriate in this case, we proceed to apply this analysis to the error alleged by defendant. We recently summarized the proper approach to plain error in *People v. Herron*, 215 Ill. 2d 167 (2005):

> "[T]he plain-error doctrine bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved error when either (1) the evidence is close, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence. In the first instance, the defendant must prove 'prejudicial error.' That is, the defendant must show both that there was plain error and that the evidence was so closely balanced that the error alone severely threatened to tip the scales of justice against him. The State, of course, can respond by arguing that the evidence was not closely balanced, but rather strongly weighted against the defendant. In the second instance, the defendant must prove there was plain error and that the error was so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process." *Herron*, 215 Ill. 2d at 186-87.

In *Herron*, the State argued against this formulation of plain-error doctrine and asked us to instead adopt the four-part plain-

error test used by the United States Supreme Court. *Herron*, 215 Ill. 2d at 179. Under the federal test, a reviewing court may correct an error not raised at trial if (1) there is error, (2) the error is plain, (3) the error affects substantial rights, and (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. *Herron*, 215 Ill. 2d at 179-80, citing *United States v. Cotton*, 535 U.S. 625, 631-32, 152 L. Ed. 2d 860, 868, 122 S. Ct. 1781, 1785 (2002). We referred to this test in *Thurow* and in *Crespo* when we established that plain-error review was appropriate for *Apprendi* violations. *Thurow*, 203 Ill. 2d at 362; *Crespo*, 203 Ill. 2d at 348. While we declined in *Herron* to adopt the federal test, we did determine that the analysis applied in *Thurow* and in *Crespo* complied with the two-pronged plain error analysis summarized in *Herron*. *Herron*, 215 Ill. 2d at 186.

*Herron*'s two prongs establish two categories of plain error: prejudicial errors, which may have affected the outcome in a closely balanced case, and presumptively prejudicial errors, which must be remedied although they may not have affected the outcome. *Herron*, 215 Ill. 2d at 185. Our analysis in *Crespo* and *Kaczmarek* indicates that the *Apprendi* violation defendant complains of in this case–a sentence based on a judge-made finding that a murder was brutal or heinous–is not a presumptively prejudicial error that must be remedied regardless of its effect on the trial's outcome. In each of those cases, we required the defendants to prove that they were prejudiced by the error. See *Crespo*, 203 Ill. 2d at 348; *Kaczmarek*, 207 Ill. 2d at 302. Thus, the second prong of the *Herron* plain error analysis is inapplicable to defendant's case.

In applying the first prong of the *Herron* analysis, we require defendant to prove both that there was an error (see *People v. Sims*, 192 Ill. 2d 592, 621 (2000) ("Before invoking the plain error exception, however, 'it is appropriate to determine whether error occurred at all' "), quoting *People v. Wade*, 131 Ill. 2d 370, 376 (1989)) and that the evidence was closely balanced. *Herron*, 215 Ill. 2d at 187. Defendant has satisfied one part of this analysis. The *Apprendi* violation he complains of is unquestionably error. See *Swift*, 202 Ill. 2d at 392. To

determine whether defendant has satisfied the remainder of the analysis, we examine the evidence adduced at trial.

At trial, witness Betty Boyer testified that she was baby-sitting at defendant's mobile home on April 6, 1988. When defendant and his wife left that evening, they had a firearm with them. After they returned home, Boyer watched another car pull up in their driveway. She testified that defendant then retrieved a baseball bat from his own vehicle. She heard defendant tell the driver of the other car, a young man, to get off his property or he would kill him. When the other man turned to walk away, she saw defendant strike him in the back of the head with the bat. She testified that defendant continued his assault with the bat as the young man fell to the ground. Defendant and his wife then picked up the other man and put him into the trunk of his own car. They left the property, with defendant's wife driving the other man's car and defendant leading the way in another vehicle.

Two witnesses testified about conversations they had with defendant in April 1988. Michael Stearns testified that defendant told him he had killed a homosexual by shooting him in the head after the victim followed him home. Stearns also testified that defendant told him he had cut off the victim's head with a knife so that if a weapon should ever be found, the ballistics could not be traced. Defendant then stated that he had buried the head and got rid of the body.

Danny Walker also testified that defendant told him he had killed a homosexual by shooting him in the head. Walker testified that defendant said he then cut off the victim's head to conceal it from ballistics testing, and put the remainder of the body in the trunk of the victim's car. Defendant told Walker that he and his wife took the body to a rural area known as Rocky Comfort and tried to burn the car after removing its stereo. Walker went with defendant to see the area where the victim's car was. When they reached the Rocky Comfort area, they saw police cars and an ambulance, and defendant commented that the authorities had already found the victim.

Stipulated testimony at trial indicated that Miley's body was discovered by a group of campers in Union County on April 9, 1988. The campers came upon an abandoned vehicle, later

identified as Miley's car, in the Rocky Comfort area. They smashed the car's windows, shot at it, and rolled it onto its roof. After they turned the car over, its trunk popped open, revealing Miley's headless body. The campers then contacted police.

Pathologist Dr. Beverly Tsai testified that the remainder of Miley's body showed no bruises or injuries. She testified that the clean cut to the neck indicated the head was severed after Miley's death. A toxicology report showed small amounts of carbon dioxide and alcohol in Miley's system. Due to the missing head, the pathologist could not make a finding as to the cause of Miley's death.

Inspector Frank Cooper of the Illinois State Police testified that the vehicle where Miley's body was found had some fire damage. Its radio was missing, and investigators did not find a wallet or wristwatch with Miley's body.

A search of defendant's residence and vehicle revealed a wristwatch identified as Miley's, cassette tapes which Miley kept in his car, and a car stereo of the type that was removed from Miley's car. The search also revealed clothing, shoes, and stereo speakers that were purchased with Miley's credit cards at department stores in Paducah, Kentucky, on April 8, 1988. Employees of those stores identified defendant in a photo lineup as the person who used Miley's credit cards to make those purchases.

The terms "brutal," "heinous," and "indicative of wanton cruelty" are given their ordinary and popular meaning. *People v. La Pointe*, 88 Ill. 2d 482, 499 (1981). For behavior to be heinous, it must be "hatefully or shockingly evil; grossly bad; enormously and flagrantly criminal." *Kaczmarek*, 207 Ill. 2d at 303 (citing *People v. Nielson*, 187 Ill. 2d 271, 299 (1999), *People v. Lucas*, 132 Ill. 2d 399, 445 (1989), and *La Pointe*, 88 Ill. 2d at 501). We define brutal behavior as "behavior that is grossly ruthless, devoid of mercy or compassion; cruel and cold-blooded." *Kaczmarek*, 207 Ill. 2d at 303 (citing *Nielson*, 187 Ill. 2d at 299, *Lucas*, 132 Ill. 2d at 445, and *La Pointe*, 88 Ill. 2d at 501). Brutal or heinous behavior generally involves prolonged pain, torture, or premeditation (*Lucas*, 132 Ill. 2d at 445), but does not necessarily require them (*La Pointe*, 88 Ill.

2d at 501). Behavior must qualify as either brutal or heinous for the sentencing enhancement to apply. Ill. Rev. Stat. 1987, ch. 38, par. 1005–8–1(a) (codified as amended at 730 ILCS 5/5–8–1(a)(1)(b) (West 2004)).

In addition to being exceptionally brutal or heinous, the crime must also be indicative of wanton cruelty. " '[W]anton cruelty' requires 'proof that the defendant consciously sought to inflict pain and suffering on the victim of the offense.' " *Nielson*, 187 Ill. 2d at 299, quoting *People v. Pastewski*, 164 Ill. 2d 189, 194 (1995). Thus, wanton cruelty cannot be perpetrated on a corpse. *Nielson*, 187 Ill. 2d at 299. In *Nielson*, this court found that burning two victims' bodies and stuffing them in a duffle bag was brutal and heinous. *Nielson*, 187 Ill. 2d at 299. However, it did not indicate wanton cruelty because defendant could not inflict pain and suffering on a corpse. *Nielson*, 187 Ill. 2d at 299. Therefore, actions taken to conceal a murder cannot show wanton cruelty, but may still be brutal or heinous.

Defendant told Stearns and Walker that he cut off Miley's head in an attempt to conceal it from ballistics testing. Expert testimony indicated that Miley was already dead when this occurred, and thus this evidence does not support a finding of wanton cruelty. However, it is cold-blooded to sever and conceal a victim's head, denying his family the closure of burying their loved one intact. This act by defendant was certainly devoid of mercy or compassion. While it does not indicate wanton cruelty, it does indicate brutality. Thus, the evidence supports a finding that defendant's crime was, at the least, brutal. We find that defendant has not met his burden of proof that the evidence was closely balanced as to whether defendant's crime was exceptionally brutal or heinous.

Defendant also told Stearns and Walker that he killed Miley by shooting him in the head. Based on this evidence, a jury could have concluded that when defendant administered the beating witnessed by Betty Boyer, he did not kill his victim, but merely inflicted the pain and suffering that is the hallmark of wanton cruelty. Boyer testified that defendant struck Miley in the head with a baseball bat when Miley had his back to defendant, and continued to strike Miley repeatedly after the victim fell to the ground. This evidence supports the finding that

˘16˘

defendant intentionally inflicted pain and suffering upon Miley, and thus displayed wanton cruelty. We find that defendant has not proved that the evidence was closely balanced on the issue of wanton cruelty.

Defendant argues that Miley "could have been dead before his body was placed in the trunk," and thus did not suffer prolonged pain. He also argues that because Stearns and Walker did not testify that defendant told them he struck Miley with a bat, it is questionable whether that beating occurred. However, these possibilities are not adequate to meet defendant's burden of proof. Defendant also compares the evidence in this case to the circumstances of *Crespo* and *Kaczmarek*. He argues that the amount of force used in this case pales in comparison to the *Crespo* defendant's repeated stabbing of his victim and the *Kaczmarek* defendant's beating, stabbing, and strangling of an elderly woman. However, the possibility that the conduct of other defendants may be even more reprehensible does not establish that the evidence of brutal or heinous conduct indicative of wanton cruelty was closely balanced in this case.

Finally, defendant argues that he was acquitted of the two "more culpable" counts of first degree murder, and therefore his crime must not have been brutal or heinous. The sentencing statute in question makes no distinction among the different ways that first degree murder may be committed. It merely provides that a defendant convicted of this crime may receive an enhanced sentence if the trier of fact finds that the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty. Ill. Rev. Stat. 1987, ch. 38, par. 1005–8–1(a) (codified as amended at 730 ILCS 5/5–8–1(a)(1)(b) (West 2004)). It contains no exception for defendants convicted of supposedly "less culpable" first degree murders. If the trier of fact has made the proper findings, a court may apply the enhancement to any defendant convicted of first degree murder, regardless of the language on the verdict form. Thus, the enhancement may be applied to defendant.

In sum, we find that defendant has not met his burden of proving that the evidence was closely balanced as to whether

his crime was exceptionally brutal or heinous and indicative of wanton cruelty. Thus, defendant has failed to show he was prejudiced by the trial court's erroneous imposition of a sentencing enhancement based on a judge-made finding. Because he has not satisfied this court's plain-error test, we decline to excuse defendant's procedural default of the *Apprendi* violation. Accordingly, we reverse the judgment of the appellate court as it pertains to defendant's sentence. We affirm the circuit court's imposition of a sentence of life imprisonment.

## IV. CROSS-RELIEF

The defendant also requests cross-relief, arguing that he has presented evidence to show that multiple jurors answered falsely to questions about potential bias or prejudice during *voir dire*. In support of this allegation, he points to a postverdict affidavit from juror Joan Davis and a letter that jury foreman Bart Masters wrote to the trial judge after the court sentenced defendant.

The contents of Davis' affidavit are as follows:

"I, Joan Davis, affiant, affirm and swear as follows:

1. That I was a juror in the trial of Richard Nitz held in April 1998.

2. Many of the jurors knew about the case before the trial and at least one juror stated that 'he's already been convicted once; how can we let him out'. She said this several times during the deliberations as did other jurors.

3. Many jurors commented on the fact that Richard did not testify and because Mr. Nitz did not testify, he must be guilty.

4. I was one of four 'hold out' jurors because I did not believe that the state proved the case against Richard Nitz. I felt pressured into signing the guilty verdict and did so only because I was told by other jurors that Richard Nitz would be sentenced to time served for the offense if we signed the least culpable verdict form.

˘18˘

5. I was upset that other jurors would consider the other trials, including Richard Nitz'[s] wife's trial results and that they would consider the fact that Mr. Nitz didn't testify."

Masters' letter to the trial judge complimented the judge on his conduct of the trial and reflected on Masters' experience as a juror. The following paragraph of the letter is relevant to defendant's argument for cross-relief:

"I recently learned of the sentence that you handled [*sic*] down in this case. I too, thought that Mr. Nitz was a danger to society 10 years ago and is still a threat. I think justice was served for [the victim's parents] and for the citizens of the state of Illinois."

This paragraph echoed a comment the trial judge made when sentencing defendant: "The court believes that Mr. Nitz was dangerous when he murdered Mr. Miley and is still dangerous."

Defendant argues that this material shows jurors answered falsely when they were asked during *voir dire* if they could give defendant the presumption of innocence and decide the case based only on the evidence presented in court. The trial court found that the Davis affidavit was inadmissible because it addressed the nature and process of jury deliberations. It denied defendant's posttrial motion for a new trial. The appellate court affirmed this judgment, noting that "we will not invite a massive attack on the sanctity of verdicts by allowing the use of comments made during jury deliberations to suggest that jurors did not perform their duty to follow the law or otherwise shirked some commitment to legal principle made during *voir dire*." 353 Ill. App. 3d at 985. Defendant cross-appeals the appellate court's decision, requesting relief in the form of a new trial. Alternatively, he asks us to remand the cause for an evidentiary hearing on this issue.

As a general rule, testimony by jurors is not admissible to impeach a jury verdict. *People v. Tobe*, 49 Ill. 2d 538, 543 (1971), quoting *People v. Pulaski*, 15 Ill. 2d 291, 300 (1958). However, certain exceptions to this rule exist. Defendant bases his argument on one such exception: that juror testimony is admissible to show that a juror answered falsely on *voir dire*

about a matter of potential bias or prejudice (*Department of Public Works & Buildings v. Christensen*, 25 Ill. 2d 273, 279 (1962)). To prevail on a motion for a new trial based on false testimony during *voir dire*, a defendant must establish that (1) a juror answered falsely during *voir dire* and (2) prejudice resulted. *Pekelder v. Edgewater Automotive Co.*, 68 Ill. 2d 136, 139 (1977), quoting *Christensen*, 25 Ill. 2d at 279-80; *People v. Harris*, 74 Ill. 2d 472, 475 (1979). This two-part test cannot be applied, however, to evidence that is inadmissible. Thus, we consider first whether the trial court erred when it declined to admit defendant's evidence of alleged juror bias. We review the trial judge's decision for abuse of discretion. *Pekelder*, 68 Ill. 2d at 138.

First, we find that any argument regarding Masters' letter has been procedurally defaulted. Defendant first raised his juror bias argument in his posttrial motion for a new trial on May 22, 1998. That motion based this argument on Davis' affidavit and the promise of two similar affidavits from other jurors, although the latter two affidavits never materialized. The trial court denied this motion and sentenced the defendant on July 29, 1998. On August 10, 1998, the court received Masters' letter and entered it into the record. Defendant filed a motion to reconsider his posttrial motion more than two weeks later, on August 29, 1998. That motion did not refer to Masters' letter, nor did defendant's attorneys raise this evidence at a motion hearing on October 7, 1998. However, defendant argues on appeal that Masters' letter supports his allegations of juror bias. A court cannot consider evidence argued for the first time on appeal. *People v. Brooks*, 187 Ill. 2d 91, 128 (1999); *People v. Steidl*, 142 Ill. 2d 204, 226 (1991). Defendant had the opportunity to raise Masters' letter when he renewed his posttrial motion or when the trial court heard arguments on that motion. He did not do so, and thus deprived the trial court of the opportunity to rule on whether this evidence was admissible. Accordingly, we will not consider it on appeal. See *Brooks*, 187 Ill. 2d at 128.

Turning to the statements of juror Davis, we must decide whether the trial court abused its discretion when it found Davis' affidavit inadmissible. Our analysis is guided by *People*

*v. Holmes*, 69 Ill. 2d 507 (1978), a case in which this court thoroughly detailed the principles that govern admissibility of juror affidavits. The evidence in *Holmes* included shoe prints that were left in the snow at the scene of a robbery attempt. *Holmes*, 69 Ill. 2d at 509. Unbeknownst to the court, several members of the jury visited a shoe store during the trial to investigate shoe sole patterns. *Holmes*, 69 Ill. 2d at 510. Both the circuit court and appellate court found evidence of the jury's extraneous investigation to be inadmissible. *Holmes*, 69 Ill. 2d at 510-11. We made the following observation about postverdict juror testimony:

> "[T]he situations in which the testimony or affidavit of a juror is offered in an attempt to impeach a jury verdict fall into two broad categories. In the first category are those instances in which it is attempted to prove by a juror's testimony or affidavit the motive, method or process by which the jury reached its verdict. These, almost without exception, have been held inadmissible. [Citations.] The second category involves those situations in which the testimony or affidavit of a juror is offered as proof of conditions or events brought to the attention of the jury without any attempt to show its effect on the juror's deliberations or mental processes. In most jurisdictions such proof is admissible." *Holmes*, 69 Ill. 2d at 511-12.

The difference between the two types of testimony is that the former attempts to show the working of the minds of individual jurors, while the latter speaks merely to the extraneous existence of conditions or occurrence of events. *Holmes*, 69 Ill. 2d at 512, quoting *State v. Kociolek*, 20 N.J. 92, 99-100, 118 A.2d 812, 816 (1955). This second type of juror testimony is subject to verification by other evidence. *Holmes*, 69 Ill. 2d at 513. Thus, juror testimony about extraneous prejudicial information is admissible, while testimony about the effect of that information on the mental processes of jury members would not be admissible. *Holmes*, 69 Ill. 2d at 514, 516, citing *Pulaski*, 15 Ill. 2d at 300. Because evidence of the shoe-store expedition was extraneous, we held it to be admissible. *Holmes*, 69 Ill. 2d at 516.

The difference between the two types of evidence is illustrated by our decision in *People v. Hobley*, 182 Ill. 2d 404 (1998). In *Hobley*, we found juror affidavits admissible regarding an incident where several nonjurors attempted to intimidate jurors at the hotel where the jury was sequestered. *Hobley*, 182 Ill. 2d at 459. However, we found that affidavits accusing the jury foreperson of improperly intimidating other jurors into a guilty vote were inadmissible because they pertained to the jury's motive, method, or process of deliberation. *Hobley*, 182 Ill. 2d at 463; see also *People v. Pitsonbarger*, 205 Ill. 2d 444, 469 (2002) (refusing to consider juror affidavits which "deal[t] exclusively with the content of private jury deliberations, albeit deliberations engaged in improperly and in violation of the court's instructions").

When courts have admitted evidence of juror bias under the *Christensen* exception now relied on by defendant, it has been evidence that complies with the rule set forth in *Holmes*. Such evidence relates not to the motive, method, or process of jury deliberations, but to the existence of some extraneous event or condition which may prejudice a juror, and which should have been revealed in *voir dire* to allow the parties and the court to make informed decisions when empaneling the jury. In *Christensen*, for example, jurors in an eminent domain case had been asked in *voir dire* whether they or any close relatives had been involved in any condemnations. *Christensen*, 25 Ill. 2d at 278. All jurors answered the question in the negative, but during deliberations one juror revealed that her brother had been involved in two condemnation suits. *Christensen*, 25 Ill. 2d at 278. We held that the trial court did not abuse its discretion by considering an affidavit on this point. *Christensen*, 25 Ill. 2d at 279-80. The fact that a juror's brother has been involved in two condemnation suits can be easily verified by extraneous evidence. An affidavit which states this fact does not involve the mental process of any juror. Thus, its admissibility complies with both *Christensen* and *Holmes*. See also *Pekelder*, 68 Ill. 2d at 137-38 (considering posttrial testimony that juror was involved in separate lawsuit at time of his jury service, something he denied in *voir dire*); *People v. Porter*, 111 Ill. 2d 386, 403 (1986) (defendant could have

˘22˘

submitted affidavit showing nature of relationship between juror and victim's mother to support his claim of concealed bias); *Schulz v. Rockwell Manufacturing Co., Rockwell International Corp.*, 108 Ill. App. 3d 113, 122 (1982) (considering posttrial affidavits stating that one juror had been fired by defendant and the husband of another juror had been involved in a lawsuit against defendant, neither of which was revealed in *voir dire*).

Although defendant argues that the affidavit of juror Davis shows prejudice not disclosed in *voir dire*, it is nevertheless inadmissible under *Holmes* because it concerns the jury's motive, method, or process of deliberations. Davis' allegations that jurors inappropriately considered defendant's previous trial and his failure to testify are not subject to extraneous proof. Unlike the fact of involvement in another lawsuit (see, *e.g.*, *Christensen*, 25 Ill. 2d at 278; *Pekelder*, 68 Ill. 3d at 137-38) or connection with a victim's relative (see, *e.g.*, *Porter*, 111 Ill. 2d at 403), the statements in Davis' affidavit cannot be verified by evidence other than the jury's own motive, method, or process. Like the affidavits in *Pitsonbarger*, Davis' affidavit addresses only the jury's private deliberations, even if those deliberations were conducted in violation of the court's instructions. See *Pitsonbarger*, 205 Ill. 2d at 469. Although *Christensen* admits juror affidavits to show bias or prejudice concealed on *voir dire* (*Christensen*, 25 Ill. 2d at 279), such affidavits must concern some evidence external to the jury's motive, method, or process (see *Holmes*, 69 Ill. 2d at 514). Thus, we hold that the trial court did not abuse its discretion in refusing to admit Davis' affidavit to show that jurors answered falsely on *voir dire*. Our decision as to the affidavit's inadmissibility makes it unnecessary to consider whether the affidavit satisfies defendant's burden to show that he was prejudiced by a juror's false testimony on *voir dire*. See *Pekelder*, 68 Ill. 2d at 139.

## V. CONCLUSION

For the reasons stated, we reverse the appellate court's modification of defendant's sentence. We affirm the trial court's imposition of a sentence of life imprisonment. We affirm the decisions of the trial court and the appellate court as they pertain to defendant's request for cross-relief.

*Judgments affirmed in part*
*and reversed in part.*

JUSTICE KILBRIDE, specially concurring:

While I agree with the majority that the application of the plain-error doctrine in *Apprendi* cases is permissible under the Supreme Court's recent decision in *Booker* (slip op. at 8-9), I am troubled for two reasons by the majority's additional approval of the harmless-error doctrine in those cases.

First, the *Booker* quotation cited by the majority (slip op. at 9) plainly sets forth two distinct rationales for the Court's beliefs that not "every sentence gives rise to a Sixth Amendment violation" and not "every appeal will lead to a new sentencing hearing." *Booker*, 543 U.S. at 268, 160 L. Ed. 2d at 665, 125 S. Ct. at 769. The Court's initial rationale is "because [the Court] expect[s] reviewing courts to apply ordinary prudential doctrines, determining, for example, whether the issue was raised below and whether it fails the 'plain-error' test." *Booker*, 543 U.S. at 268, 160 L. Ed. 2d at 665, 125 S. Ct. at 769. See slip op. at 9. This statement provides an appropriate basis for the majority's conclusion that cases involving sixth amendment violations are subject to plain-error analysis, and I concur in that assessment.

The *Booker* Court then notes the second rationale underlying its beliefs, stating "[i]t is *also because, in cases not involving a Sixth Amendment violation*, whether resentencing is warranted or whether it will instead be sufficient to review a sentence for reasonableness may depend upon application of the harmless-error doctrine." (Emphasis added.) *Booker*, 543 U.S. at 268, 160 L. Ed. 2d at 665, 125 S. Ct. at 769. While this statement does not expressly bar the use of harmless-error analysis in sixth amendment/*Apprendi* cases, it most assuredly does so implicitly. Indeed, I can conceive of no reason for adding that carefully tailored limitation other than to remove those cases from the broad category of matters subject to the doctrine of harmless error. That limitation on the use of harmless error is particularly striking because the *Booker* Court's approval of the use of plain-error analysis in the

immediately preceding sentence contains no hint of any similar limitation. For this reason, I believe the majority's opinion improperly relies on *Booker* to support the unjustified reaffirmation of prior holdings on the use of harmless-error analysis in *Apprendi* cases as announced in *Thurow* and its progeny. Slip op. at 11, 12.

Not only do I believe the majority errs in reaffirming prior harmless-error holdings by overlooking the specific limitations expressed in *Booker*, but I also conclude that the majority reaches that decision prematurely and unnecessarily. Prior to beginning its *Booker* discussion, the majority correctly notes that, under this court's prior case law, plain-error analysis applies when a defendant has failed to object to an alleged error while harmless-error applies when a defendant has raised a timely objection. Slip op. at 7. As the majority properly concludes, "[i]n the instant case, defendant did not make a timely objection to the extended-term sentence he received based on the trial judge's finding that his conduct was brutal or heinous. Thus, plain-error analysis applies to a review of his sentence. [Citations.] The appellate court erred by applying harmless-error analysis." Slip op. at 8.

If at that point the majority had examined the effect of the *Booker* decision on the use of plain-error analysis in this case, found it to be permissible, conducted its own plain-error review, and ultimately concluded that plain error was not shown, I would have had no qualm with the opinion. Instead, the majority engages in a *dicta*-laden discussion of the applicability of harmless-error analysis in sixth amendment cases, ending in its extension of the harmless-error doctrine to those matters under the auspices of *Booker*. Only after treading down that dubious path, does the majority focus on the resolution of defendant's plain-error claim.

As the majority repeatedly concedes, *Nitz* is a plain-error

case. Slip op. at 8, 11. It is not a harmless-error case. For this

reason, I disagree with the majority's unnecessary discussion

of the application of that doctrine to sixth amendment cases.

By properly deciding this case on the basis of plain error, the majority has no need to consider the propriety of the harmless-error doctrine in this or any other sixth amendment case and, further, to conclude that the use of harmless-error analysis announced in *Thurow* has now been given the Supreme Court's imprimatur of approval in *Booker*. As I have explained, *Booker* simply does not support that conclusion. Accordingly, I reject those portions of the majority's analysis, while concurring in its plain-error review as well as the remainder of its opinion.